THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RODGER N. GRADY, Defendant-Appellant.

First District (5th Division)    No. 81-33

Opinion filed July 9, 1982.

David L. Lee, of Winston & Strawn, and Ralph Ruebner, of State Appellate Defender's Office, both of Chicago, for appellant.

Richard M. Daley, *State's Attorney*, of Chicago (Michael E. Shabat, Casimir J. Bartnik and Thomas A. Rieck, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MEJDA delivered the opinion of the court:

Defendant was charged with murder, armed violence, attempted murder and aggravated battery, tried before a jury and found guilty of all counts. He was sentenced to an extended term of 50 years for murder and to 20 years for aggravated battery to be served concurrently. Defendant appeals.

The issues raised on appeal are: (1) whether the trial court should have suppressed the lineup identifications because the lineup was suggestive; (2) whether the trial court improperly prevented the defense from cross-examining a prosecution witness as to a battery charge which had been stricken with leave to reinstate (SOL'd) one week prior to testifying; (3) whether it was improper to admit into evidence photographs of the scene of the crime which inaccurately portrayed the lighting conditions at the time of the crime; (4) whether the trial court improperly prevented a forensic pathologist from giving his opinion as to the effect the alcohol level found in the blood of the victim would have on one's consciousness; and (5) whether the trial court improperly sentenced defendant to an extended term sentence. The following evidence was adduced at trial.

Michael Berry testified that on May 8, 1979, he and his friends were playing basketball at Dawes Park until 9:30 p.m. While he was near a water fountain in the park, the defendant and some of the defendant's friends approached him and started an argument. When Berry called to his own friends, the defendant's group and the defendant left.

About an hour later Berry was at 7919 S. Wood Street. Ernest Durham, Irving Wright, Larry Muse, Tim Quinn and Milton Robinson were

also present on the east side of the street in front of a courtyard building. Berry was sitting on a short wall across the front of the courtyard listening to his radio. Durham and Muse were standing on the grass talking to each other in front of the building. Wright was on the grass walking toward Durham and Muse. Quinn was approaching the group from the other side of the street where another group of people was located. The lighting conditions were described as very good. The scene was lit by building lights and two streetlights each more than 50 feet away.

A black man, about 5'10" with short black hair, wearing dark blue pants and a green sweatshirt with white lettering across its front, approached. This man was later identified as the defendant. Defendant had just passed the curb and was on the walkway when defendant spoke to Wright and asked him about Berry. Wright looked at his face during this conversation. Then someone yelled that Berry was present. At this point the defendant pulled out a gun and told Wright not to lie. The defendant fired a shot in the air and told everyone to get down.

Durham and Wright crouched but continued to watch the defendant. From a short distance they saw the defendant walk to Muse, shoot him in the chest and kick him in the face. When Robinson heard the first shot he began to walk toward 80th Street. However, Robinson looked back over his shoulder and saw the assailant, who was two feet from Muse, shoot and kick Muse. Quinn, who knew the defendant from high school, saw him shoot and kick Muse. Quinn was eight feet from the defendant at this time and it was light enough to see the defendant. After Muse was shot Quinn began to walk back across the street but he turned and saw the defendant then shoot Berry. Durham was still in a crouching position and was much closer than Quinn to the defendant. Durham saw the defendant shoot Berry twice. Wright ran between the parked cars but saw the defendant chase Berry around the short wall at the front of the courtyard. The defendant shot Berry once and Berry threw a radio at the defendant. Defendant shot Berry a second time. Berry told investigators later that he did not get a good look at the defendant's face.

After shooting Berry defendant pointed his gun at Wright and pulled the trigger, but the gun did not discharge. Defendant fled, and Wright and Durham gave chase. Defendant tried to shoot his pursuers two more times during the chase, but the gun did not discharge. Eventually Durham and Wright cornered the defendant in the rear of 7932 S. Hermitage. The police arrived shortly thereafter and removed the defendant from the building. Wright entered the building but was ejected by the police.

A few hours later a lineup was conducted at the police station. The lineup consisted of five black men of approximately the same height and build. In the lineup defendant wore a green sweatshirt turned inside out.

Each of the four eyewitnesses identified defendant as the assailant. Each also made an in-court identification of defendant.

Defendant testified that on the night in question he left his mother's house to go jogging at 9:15 p.m. Defendant stopped at O'Halloran Park to look for friends. Failing to find any friends in the park, he headed to a barbeque place at 79th and Wood Streets. He was walking on the east side of the street but crossed the street to avoid a group of people on the east side of Wood Street. Defendant saw another group of people on the west side of the street. While crossing from the east side to the west side of Wood Street, defendant heard a shot. He started to run towards 79th Street. He heard someone say, "There go one of them." Defendant saw only one person chasing him through the alleys and yards.

Defendant testified that he ran towards the only light he saw. He broke into the rear of the building for protection. He told a man to call the police because someone was shooting. About 15 to 20 minutes later, a police officer arrested him.

The jury found defendant guilty of all counts. Defendant received an extended term sentence of 50 years for murder and 20 years for aggravated battery to run concurrently. Defendant appeals.

OPINION

Defendant first contends that the lineup was impermissibly suggestive because of the five men in the lineup only the defendant wore a green sweatshirt and that the in-court identifications of defendant were tainted thereby.

An accused is entitled to a fair identification procedure and is deprived of due process if considering the totality of the circumstances a pretrial confrontation is unnecessarily suggestive and conducive to mistaken identification. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.) An unnecessary and suggestive identification procedure does not per se require exclusion of the identification testimony. Such testimony is admissible if it is reliable considering the totality of the circumstances and there is not a very substantial likelihood of irreparable misidentification. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.) Factors to consider in determining the reliability of identification evidence, despite its suggestive aspects, include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation and the time between the crime and the confrontation. (*Manson.*) These principles have been adopted and applied by the Illinois

Supreme Court. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

Defendant cites *People v. Franklin* (1974), 22 Ill. App. 3d 775, 317 N.E.2d 611, and seveal other non-Illinois cases for support of his argument that because he was the only individual in the lineup wearing a green sweatshirt the lineup was improperly suggestive.[1] The *Franklin* court held that forcing defendant alone to wear the clothes worn by the perpetrator, hot pink pants, a camel hair coat and a black hat, made the lineup unduly suggestive. In rendering its ruling the court stated that lineup suggestiveness must be made on an objective basis and not be determined on the subjective basis of its effect on the witnesses. However, *Franklin* and the other cases cited by defendant were decided three years prior to the United States Supreme Court decision in *Manson*, which in effect rejected the per se inadmissible approach taken in *Franklin*. For as discussed previously, *Manson* states that in determining whether lineup identification should be suppressed, the focus should not be only on the procedures employed in the lineup but also on factors such as the witness' opportunity to view the criminal at the time of the crime, a subjective criterion. This two-step approach of evaluating whether identification evidence should be suppressed was impliedly utilized in *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513. There the court found that although the one-man show-up identifications of defendant made in a parking lot were suggestive, they were still reliable after evaluating the totality of the circumstances using the factors set forth in *Manson*.

■■ Lineups have been held not to be impermissibly suggestive even though defendant was the only person in the lineup wearing a particular article of clothing, worn by or similar to that worn by the perpetrator. (*People v. Anthony* (1980), 90 Ill. App. 3d 859, 418 N.E.2d 757; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121; *People v. Young* (1981), 97 Ill. App. 3d 319, 422 N.E.2d 1158; *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999.) At the hearing on defendant's motion to suppress, defendant called Durham, Wright and Quinn as witnesses. All testified that the assailant wore a green shirt with white lettering. Officer Gonzales testified that when interviewing the witnesses prior to the lineup, Durham and Wright had described the assailant as wearing a green shirt. Quinn had described him as wearing a green shirt with white lettering. The picture in evidence of the lineup shows that no white lettering was visible on the similarly colored shirt that defendant wore.

---

[1] Defendant also cites *Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127, in support of this argument. However, *Foster* concerned repeated confrontations between a suspect and a witness. The court concluded the repeated confrontations were so suggestive as to violate due process. *Manson v. Brathwaite* (1977), 432 U.S. 98, 105 n.8, 53 L. Ed. 2d 140, 148 n.8, 97 S. Ct. 2243, 2248 n.8.

Therefore, as defendant was then wearing a green shirt without the identifiable white lettering, the similarly colored shirt did not make the lineup so suggestive as to make the lineup identification invalid. *Young*; see *People v. Spence* (1976), 43 Ill. App. 3d 1044, 357 N.E.2d 1245.

Even assuming, *arguendo*, that the lineup was suggestive, the factors in *Manson* and *Manion* must still be applied to determine if the identifications were nonetheless reliable. The record shows that although the incident occurred at night, the lighting was described as very good. The four lineup witnesses had a good opportunity to view the assailant as they were in close proximity to him at the time of the incident, had unobstructed views of him, and as defendant took the time to have a conversation with Wright, shoot Muse, kick Muse, and shoot and chase Berry around the building. After the shooting ended two of the witnesses chased the assailant from 7919 S. Wood to 7932 S. Hermitage. During the chase the assailant stopped, turned and fired again at his pursuers. Additionally, Quinn testified that he had seen the assailant previously at least a hundred times when they were both high school students, although that was three years previous to the shooting. All the witnesses described defendant as approximately 5'10" to 5'11", black, slender to medium build, with short hair, wearing blue pants and a green shirt and no jewelry. Each was definite in his identification. Furthermore, only four hours elapsed between the shooting and the identifications. Thus, in light of the totality of the circumstances, even if the lineup was suggestive, the identifications were reliable, resulting in no prejudice to defendant.

In light of the foregoing, it is unnecessary to consider whether the in-court identifications were proper, as "any identification in the 'wake' of a reliable out-of-court identification is admissible." *People v. Manion* (1977), 67 Ill. 2d 564, 572, 367 N.E.2d 1313, 1317.

■■ Defendant next contends that the trial court improperly prohibited defense counsel from cross-examining Berry on bias relative to a battery charge that had been SOL'd the week before he testified. It is well settled that the trial court is vested with substantial discretion to determine both the manner and scope of cross-examination, and its decision on such issues will not be overturned absent a showing of clear abuse of that discretion resulting in manifest prejudice. (*People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694.) However, showing interest or bias on the part of a witness is an accepted method of impeachment and the fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influenced by interest, bias or a motive to testify falsely. (*People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835.) These matters should not be resolved solely *in limine*. *People v. Eddington* (1979), 77 Ill. 2d 41, 394 N.E.2d 1185.

■■ The trial court conducted a hearing outside the presence of the jury

on the defendant's motion to allow cross-examination as to whether any promises of leniency on the battery charges had been made in exchange for Berry's testimony in the instant case. Although Berry knew that "SOL" meant stricken off with leave to reinstate, he thought that meant the case was thrown out of court and did not know that it could be reinstated within 160 days. Berry testified that no State's Attorney or assistant State's Attorney had discussed leniency with him on the battery charge or had tried to make a deal in exchange for his testimony. The assistant State's Attorney also offered to testify that no promises of leniency or other consideration had been made in exchange for dismissal of the battery charges. Furthermore, the court ruled that the defense could cross-examine Berry relative to the circumstances of the charge being SOL'd but the court precluded inquiry into any alleged leniency or promises of leniency in exchange for Berry's testimony. The record indicates, however, that even though the court allowed defense counsel to cross-examine Berry as to the SOL'd charges and thus make the jury aware of their existence—the defense did not cross-examine Berry on this point during trial. Therefore, under these circumstances the trial court's ruling was not an abuse of discretion, and further, defendant can hardly claim prejudice when he did not even cross-examine Berry as permitted by the court. See *Eddington.*

■■ Defendant next contends that the photographs of the scene should not have been admitted into evidence because they did not accurately portray the lighting conditions at the time of the occurrence. Defendant raised this issue in his written post-trial motion for a new trial; however, he did not object to these photographs being entered into evidence. As a timely objection to the entry of evidence is required, any error committed here is deemed waived. *(People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Furthermore, defense counsel extensively cross-examined Ronald Hale who took three of the four challenged photographs. He testified that the exhibits did not portray the lighting conditions during the crime as seen by the human eye and explained the differences between those conditions as perceived by the human eye and the conditions as depicted by the camera. Therefore, the jury was not misled nor could prejudice result from the introduction of the photographs.

Defendant next contends that the trial court improperly prevented a forensic pathologist from giving his opinion as to the effect the alcohol level found in the blood of the victim would have on one's consciousness. ■■ The pathologist was allowed to testify that the level of alcohol found in the victim's blood would be considered high. He was not allowed to testify as to the effect of that level on behavior. Defendant asserts that this exclusion was error because the jury could have used its common ex-

perience to determine that the blood alcohol level of the State's witnesses approximated that of the deceased, thus inferring the "possible" intoxication of the witnesses by any intoxication found in the victim. The State contends that the excluded testimony was irrelevant and immaterial and therefore was properly excluded. It is elementary that to be admissible evidence must be relevant and material; it must end to make a proposition at issue either more or less probable. (*People v. Yuknis* (1979), 79 Ill. App. 3d 243, 398 N.E.2d 258.) In the instant case evidence of the high level of alcohol found in the victim's blood introduced to prove that the State's witnesses were drinking would be too remote and uncertain to justify its admission. (*Yuknis*.) Furthermore, the pathologist was allowed to testify that a high level of alcohol was found in the victim's blood. From that alone the jury might infer that the witnesses had also consumed large quantities of alcohol. Therefore, we fail to see any prejudice resulting from the court's ruling.

Finally, defendant contends that the trial court improperly imposed an extended-term sentence. We disagree. When section 5—8—2(a) of the Unified Code of Corrections is read in conjunction with section 5—5—3.2(b)(2), an extended sentence may be imposed if the most serious felony, of which the offender is convicted, is accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (*People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520; Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—2(a) and 1005—5—3.2(b)(2).) In evaluating the brutality and heinousness of an offense, the entire spectrum of facts surrounding the given incident must be analyzed and evaluated. (*People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823.) Examples of conduct which have been considered sufficiently heinous and brutal to warrant imposition of an extended-term sentence include unnecessarily terrorizing a victim (*People v. Young* (1981), 96 Ill. App. 3d 426, 420 N.E.2d 1051; *People v. Jones* (1979), 73 Ill. App. 3d 99, 391 N.E.2d 767); inflicting multiple stab wounds (*People v. Childs* (1981), 95 Ill. App. 3d 606, 420 N.E.2d 513; *People v. Gray* (1979), 80 Ill. App. 3d 213, 399 N.E.2d 206); stabbing a victim after shooting the same victim (*Devine*); beating and choking a victim to death (*People v. Davis* (1981), 98 Ill. App. 3d 461, 424 N.E.2d 630); and beating a victim in an unprovoked attack (*People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175). Furthermore, the heinous or brutal behavior directed at the victim can occur after the victim is dead. *Devine.* ■■ In the instant case the trial court specifically referred to the unprovoked nature of the attack and the fact that defendant kicked the victim after shooting him. The general rule is that imposition of a sentence is a matter of judicial discretion and absent an abuse of discretion, the sentence of the trial court may not be altered upon review. (*People v. Perru-*

*quet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In light of the circumstances and factors considered by the trial court, the imposition of the extended term was not an abuse of discretion.

For the reasons cited herein the judgment of the trial court is affirmed.

LORENZ and WILSON, JJ., concur.