THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD BEDONY, Defendant-Appellant.

First District (1st Division)    Nos. 87—2707, 87—2840 cons.

Opinion filed August 1, 1988.

Stone, McGuire & Benjamin, of Chicago (Michael L. Siegel, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Kim A. Novi, and Clarke P. Devereux, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Richard (Rick) Bedony, was tried in a bench trial and convicted of the attempted murder of George Georgitsis in the circuit court of Cook County. Bedony was subsequently sentenced to an extended term of 45 years' incarceration.

Rick Bedony worked at the Jewel food store on Touhy Avenue in Skokie, Illinois. In approximately November 1985, he met and began to have a sexual relationship with another Jewel worker, Jacquelyn (Jackie) Georgitsis, who was, at the time, married to George Georgitsis. The relationship between the defendant and Jackie continued steadily until at least May of 1986. The testimony at trial was conflicting as to whether George knew of Jackie and Rick's affair.

At trial, Jackie testified that a few days prior to May 2, 1986, she told the defendant that she thought she was pregnant, that she did not want the baby, and that she wanted to end their relationship. She testified that defendant was very upset by this, and that he wanted her to leave her husband George so that they could be together. The defendant, however, denied that Jackie told him of a possible pregnancy at that time and denied that she told him that she wanted to end their relationship just prior to May 2, 1986.

On May 2, 1986, at approximately 10 a.m., George Georgitsis testified that he was at home and that he received a phone call from the defendant who, he claimed, he knew as the boyfriend of his wife's friend Jackie Rockford. Admittedly, this was how Jackie and Rick kept their affair a secret from George. According to George, the defendant called to tell George that his car had broken down, and asked George to fix it, since George ran an auto repair business. George testified that the defendant came over to his house sometime between 10:03 and 10:15 a.m. After he arrived, George allegedly called his friend and business partner, Steve McNally, and asked him to drive over to George's so that they could go get the defendant's car. George stated that after he called Steve, he took the defendant upstairs to the "drum room" to conduct their business. George testified that when he turned his back, defendant repeatedly hit him on the head with the pipe from a barbell, which he had been carrying under his arm when he arrived. George testified that the defendant then pulled a gun out and ordered George to lay face down on the floor, looking down a laundry chute. George said that, at that point, he got up, kicked open the door to the adjoining back porch, walked out onto the porch and sat down on the porch. According to George, the defendant shot him while he was sitting on the floor of the porch. George stated that all he remembered after that was waking up in the hospital.

George's friend, Steve McNally, testified that George called him between 10:15 and 10:30 a.m. to ask if he could pick up George and the defendant and take them to the defendant's car. McNally stated that he got to the Georgitsises' home at about 11:15 a.m. and he honked his horn, but no one responded. A neighbor of the Georgitsises stated that he spoke to McNally at around 11 a.m. and that McNally told him that he was looking for George so that he could take them to defendant's car. Georgitsis' next door neighbor testified that at approximately 10:20 to 10:25 a.m., he heard two shots which came from the back of the Georgitsises' house.

At approximately 4 to 4:30 p.m. on May 2, Jackie Georgitsis came home from work and found George on the back porch, bleeding and semiconscious. Moments thereafter, George's mother came home from work also. George was then taken to the hospital, where he was treated for a gunshot wound to the head, and, as a result of that wound, suffered some memory loss. Although George's mother testified that she asked George, soon after he was found, if he had taken drugs or been drinking and he answered no, a police detective testified that the mother had told him that George said that he had taken

drugs and been drinking. Further testimony established that three empty shell casings were found on the back porch and a fourth empty shell casing was found in the bedroom. Additionally, it was established that a window on the back porch had been broken sometime on May 2.

The defendant presented an alibi defense, claiming that he arrived at work between 10:15 and 10:30 a.m. and that, therefore, he could not have shot George just before 10:30 a.m. He presented witnesses who saw him that morning, and, although none of the witnesses saw the defendant arrive at Jewel, one witness, Charles Wallace, testified that he saw defendant arrive at Jewel sometime between 10:15 and 10:30 a.m. Jackie Georgitsis testified that it takes from 10 to 25 minutes to get from her home to the Jewel on Touhy Avenue. The prosecution, however, presented the testimony of a police detective who had timed a route from the Georgitsises' home to the Jewel a few days later and found that it took nine minutes to travel the distance.

On the evening of May 2, 1986, Jackie called the defendant, more than once, and, allegedly, told him about George's shooting, and asked him not to say anything about their affair. Defendant was questioned by police and, at first, denied having sex with Jackie, but later admitted to it. On May 6, after the defendant was released by the police, he left a note on a dollar bill, on Jackie's car, which read, "Please call me. I love you so much. I need you." George then identified defendant's photo from a photo line up, although he referred to him at different times as Rick, Rick-Mike or Mike. Jackie and Rick resumed a relationship sometime after May 2, 1986, and that relationship ended on September 20, 1986.

The trial judge found the defendant guilty of attempted murder and sentenced him to an extended-term sentence of 45 years because the trial judge found the crime to be exceptionally brutal and heinous. On defendant's motion for a new trial, defense counsel attempted to present the affidavit of a private investigator to attest that the travel time from the Georgitsises' home to the Jewel was approximately 11 to 15 minutes. That motion was denied. Defendant now appeals both his conviction and the extended-term sentence.

The defendant raises three issues on review: (1) whether defendant was proven guilty beyond a reasonable doubt; (2) whether the defendant received ineffective assistance of counsel; and (3) whether the trial judge erred in imposing an extended-term sentence.

■■ ■ The first issue that defendant raises for review is whether the trial court erred in finding the defendant guilty beyond a reasonable doubt. A criminal conviction will not be set aside unless the evi-

dence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 276.) The relevant inquiry is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 276, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■ Defendant contends that the evidence did not establish his guilt beyond a reasonable doubt because: the evidence as to defendant's alleged motive was incredible; the evidence as to the defendant's alibi was inconsistent with evidence that he attempted to murder George Georgitsis; and the evidence showed that the defendant and the defense witnesses were more credible than the State's witnesses. The State, on the other hand, argues that the defendant was proven guilty beyond a reasonable doubt because: George Georgitsis positively identified the defendant; George Georgitsis' testimony was substantially corroborated by other witnesses; the evidence established defendant's motive and his premeditation; and the testimony of Charles Wallace, who stated that defendant arrived at work between 10:15 and 10:30 a.m., was properly disregarded by the trial court since it was contradicted by testimony of other witnesses.

Here, viewing the facts and evidence in the light most favorable to the prosecution, a credible motive for the attempted murder of George Georgitsis was established by Jackie's testimony in which she stated that days earlier she had told defendant she wanted to end their relationship and that the defendant was upset because he did not want to end it. Also, the defendant admitted to leaving a note on a dollar bill on Jackie's car after the shooting which read, "Please call me. I love you so much. I need you." In regards to defendant's alibi, the trial court considered all of the conflicting evidence and found that the State's evidence, namely the testimony of George as to when the defendant actually arrived at work, was simply more credible than the testimony of Charles Wallace. Looking at the evidence in the light most favorable to the prosecution, the defendant could have beaten and shot George and still arrived at work at approximately 10:30 a.m. or soon thereafter. While it is true that George Georgitsis, the State's most important witness, did suffer a memory loss as a result of his injuries, and that there were certain inconsistencies in his testimony,

there was also evidence presented through other witnesses which corroborated George's testimony. Thus, again viewing the evidence in the light most favorable to the prosecution, the evidence was not so improbable or unsatisfactory as to create a reasonable doubt as to the defendant's guilt.

■■ ■ The second issue raised by the defendant is whether he received ineffective assistance of counsel. To support a charge of ineffective assistance of counsel, a defendant must prove two elements: first, that his attorney failed to perform as a reasonably competent attorney, and second, that there exists a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different, *i.e.,* that the defendant was prejudiced by the attorney's actions. (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 1077, 501 N.E.2d 863, 864, *appeal denied* (1987), 114 Ill. 2d 556.) A reasonable probability has been defined by the Supreme Court as one that is sufficient to undermine confidence in the outcome, and, to make this finding, a court must consider the totality of the evidence presented to the finder of fact. (*Strickland,* 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) Under the guidelines set forth in *Strickland,* the focus is upon the fundamental fairness accorded the defendant at the trial. Underlying this framework, however, is the strong presumption that counsel's conduct falls within the broad realm of reasonable professional assistance, and therefore, a reviewing court will not second guess matters which involve counsel's judgment, discretion, trial tactics or trial strategy. *People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 486 N.E.2d 1323.

■ Defendant here claims that his trial counsel was ineffective because he failed to rebut the testimony of the police detective who stated that it took him nine minutes to travel from the Georgitsis' home to the Jewel food store on Touhy. Defendant argues that because the timing was crucial in this case, trial counsel should have presented rebuttal evidence to establish that the travel time was longer than nine minutes, and, further, that this evidence was available to the defense at the time of trial, but was not presented until after the trial in defendant's motion for a new trial. The defendant claims that if this rebuttal evidence would have been admitted at trial, it would have resulted in a finding of not guilty by the trial court. Thus, the defendant concludes that the failure of counsel to present this evidence satisfied the *Strickland* requirements. The State, on the contrary, argues that the trial counsel's failure to rebut the testimony of the detective was merely a matter of trial strategy and, as such,

within the broad range of reasonable professional assistance.

The defendant has not shown how the presentation of rebuttal evidence would have made the outcome of the trial different. While it is true that the time to make the trip to the Jewel was critical to defendant's alibi defense, it is also true that the trial judge was aware of this and, thus, specifically stated that his finding against the defendant was based upon his belief that the detective's testimony was credible. The court noted that the detective testified that traffic at the time he made the test was moderate, as it would have been on May 2 at about 10 or 11 a.m. Moreover, the trial judge noted that he was familiar with the area and that the route travelled by the detective was probably not the quickest route. Additionally, Jackie Georgitsis testified that it took her anywhere from 10 to 25 minutes to get from her home to the Jewel on Touhy. Here, since evidence was presented to show that the travel time could have been longer than nine minutes, defendant's argument that further testimony as to a longer travel time would change the result is without merit. Accordingly, the necessary prong of the *Strickland* test has not been met, and, thus, the claim of ineffective assistance must fail.

■ The third issue defendant raises for review is whether the trial court erred when it imposed an extended-term sentence. A trial judge is accorded broad discretion in the sentencing phase of a trial, in order to permit a reasoned judgment concerning the particular circumstances of each case. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) Our supreme court, in *La Pointe*, emphasized that the basis for the extended-term sentence is to ensure that the punishment is appropriate, based on the particular circumstances of the case, and to ensure that society is protected from those individuals who demonstrate, by their conduct, their capacity for particularly brutal and heinous crimes and which are indicative of wanton cruelty. See *La Pointe*, 88 Ill. 2d at 500-01, 431 N.E.2d at 352.

■ Specifically, under section 5—8—1 of the Unified Code of Corrections, the maximum sentence for attempted murder, which is a Class X felony, is 30 years, and under section 5—5—3.2, a defendant is eligible for an extended-term sentence of not less than 30 years and not more than 60 years, if the defendant's acts were accompanied by exceptionally brutal and heinous behavior. (See Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2, 1005—8—1, 1005—8—2.) "Heinous" has been defined by the Illinois Supreme Court as "hateful or shockingly evil: grossly bad: enormously and flagrantly criminal"; and "brutal" includes "grossly ruthless," "devoid of mercy or compassion: cruel and cold-blooded." (*La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353,

citing Webster's Third New International Dictionary (unabridged) 1050, 286 (3d ed. 1981).) In *La Pointe*, the supreme court considered the defendant's significant history of criminal activity, his callous attitude after the murder and his complete lack of remorse to constitute exceptionally brutal and heinous behavior, and, thus, these considerations provided a sufficient basis for the imposition of an extended sentence. (See *La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.) The *La Pointe* court further noted that extended terms may be imposed for murders involving torture or infliction of unnecessary pain. *La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.

■ What constitutes brutal and heinous behavior must necessarily be based upon the facts of each case. This court has, in certain decisions, emphasized the "exceptional" nature of a defendant's acts in affirming extended sentences, *e.g.*, intoxication and rape of a child, home invasion and threats to children of victims, rapes combined with beatings or multiple stab wounds. (See *People v. Kane* (1986), 140 Ill. App. 3d 928, 489 N.E.2d 500.) Other decisions, however, have focused upon the premeditation and lack of provocation as the basis for affirming extended terms, *e.g.*, beating and choking a victim to death, beating a victim in an unprovoked attack, and terrorizing a victim. See *People v. Grady* (1982), 107 Ill. App. 3d 970, 438 N.E.2d 608; *People v. Kane* (1986), 140 Ill. App. 3d 928, 932, 489 N.E.2d 500 (Linn, P.J., dissenting).

Here, as noted previously, the trial judge found that the defendant was eligible for an extended term and sentenced defendant to 45 years' imprisonment. The defendant here has requested this court to reduce his sentence, arguing that the trial court erred in imposing the extended term because his actions here did not constitute exceptionally brutal and heinous behavior. Furthermore, the defendant continues he never had any problems with the law previously, and he, in fact, had a fine record. The State, however, contends that the premeditated acts of the defendant constituted brutal and heinous behavior, and, hence, the trial judge properly imposed an extended-term sentence.

■ In this case, we concur with the defendant that the trial court abused its discretion in imposing the extended-term sentence. The beating and shooting of George Georgitsis here did not fall within the definitions of exceptionally brutal and heinous behavior or constitute acts which were ones completely devoid of mercy or compassion or ones that involved torture or grossly ruthless behavior. Additionally, the defendant established a number of persuasive factors in mitigation at his sentencing hearing, such as his family background, his

622

education, his work record, his lack of drug or alcohol abuse, and, importantly, that this was his first offense or problem of any kind with the law. However, while we believe that defendant's acts here did not warrant an extended-term sentence, we do find that the premeditation of the defendant's acts, the multiple head beatings, the forcing of Georgitsis to lay down on the floor, and his flight after the shooting justified the imposition of the maximum sentence of 30 years. See *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.

For all of the foregoing reasons, the defendant's conviction for the attempted murder of George Georgitsis is affirmed, and the defendant's sentence is reduced to a sentence of a term of 30 years in the Illinois Department of Corrections.

Affirmed as modified.

CAMPBELL, P.J., and MANNING, J., concur.