THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY MANGUM, Defendant-Appellant.

Second District    No. 2—92—0613

Opinion filed April 15, 1994.

INGLIS, P.J., dissenting.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Johnny Mangum, was convicted by a jury of second-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—2 (now 720 ILCS 5/9—2 (West 1992))), and the court sentenced him to a maximum extended term of 30 years in prison. He contends on appeal that the trial court improperly imposed a maximum extended-term sentence.

On February 26, 1991, police were called to the Rockford home of Randy Eklund by friends who had discovered that the door to the house was open. The police entered the home and found a large amount of blood in the kitchen area. Eklund's body was found on the second floor, lying on its stomach in a pool of blood. His feet were tied together and his hands were tied behind him. Defendant was ultimately charged with first-degree murder in an indictment alleging that he strangled Eklund, knowing that his act created a strong probability of death and, in fact, causing death.

At trial defendant acknowledged that he was involved in Eklund's death but denied that he had murdered him. Defendant said he first met Randy Eklund at Pribby's Tavern in Rockford. Eklund, a homosexual, was described as 6 feet 3 inches tall and weighing 210 pounds. The two men began a conversation, and Eklund bought a number of drinks for defendant. Eventually, the defendant accepted Eklund's invitation to his home for another drink, and the two rode

to the house in Eklund's car. Eklund prepared drinks for them in the kitchen, and defendant agreed to attend a party with Eklund. During the last of several phone calls he made at this time, Eklund became upset and was still cussing when he rejoined defendant in the kitchen. He then reached over, grabbed the defendant's crotch, and started squeezing.

Defendant, who indicated he was 5 feet 7 or 8 inches tall and weighed 142 pounds at the time, pushed Eklund's hand away and told him to stop. Eklund did not do anything immediately; he just looked at defendant. Then he got up, walked over, and pulled defendant toward himself by the coat collar, saying, "I bought you all those drinks and I'm going to suck your dick." Defendant said that, at this point, he "snapped" and "freaked out." The situation scared him. He described Eklund as a lot bigger than himself and very intimidating.

Defendant, who had trained as a boxer and fought as a novice in a local "Golden Gloves" competition more than 10 years ago, got up and started hitting Eklund. The two men fought through the kitchen onto the landing at the top of the basement stairs, near the back door. Eklund shoved defendant down the stairs and then started to go out the back door. Although defendant had hurt his head and leg in the fall, he was now angry, as well as scared. He climbed up the basement stairs, pulled Eklund back inside, and punched him, knocking him to the floor. Eklund got up and ran out of the kitchen.

According to defendant, he thought Eklund was going to get a gun so he followed him upstairs and again hit him until he went down. Defendant testified that, as part of his training for boxing, he was taught to use the knuckles of his index and middle fingers to strike opponents. Defendant also admitted that he hit Eklund all over his face, head, neck, and chest, and that Eklund was cut and bleeding during the fight. After Eklund fell to the floor, defendant told him to get on his stomach. When Eklund did so, defendant used the laces from Eklund's shoes and from his own boots to tie Eklund's hands behind his back and his feet together. Defendant said he did not hit Eklund again after he fell to the upstairs floor.

After tying Eklund, defendant started looking into the bedrooms. However, Eklund sat up and then fell on his back, making a gurgling noise. Thinking Eklund might be choking on his own vomit, defendant turned him over onto his stomach. The gurgling stopped and defendant then searched through the bedrooms for a gun, with no success. At the time defendant left the second floor, Eklund seemed okay. Since the gurgling had stopped, defendant figured Eklund was alive and no longer choking.

Defendant then filled a garbage can with bottles of liquor belonging to Eklund and put it, along with Eklund's microwave oven, in Eklund's car. Having found Eklund's car keys, defendant first drove to Roger Conley's apartment and left the liquor and microwave. He then drove the car to the vicinity of Pribby's Tavern and parked it, figuring that Eklund would report it stolen and that it would be found there.

Later that evening defendant attended a party at Conley's apartment. According to witnesses, he paced about and seemed preoccupied and was overheard to say to Conley: "I hit the guy and I hope he doesn't die." When asked why he was not wearing his boots, defendant responded that he had to get rid of them because he had "robbed a faggot and beat the guy up and tied him up and left him in the house."

Defendant said that it was three or four days after the fight that he first learned Eklund had died. He then left Rockford and hitchhiked through various States until he was arrested in Wichita, Kansas, some five months later.

Additional evidence was presented by Barry Meyers, a friend of Eklund's for about 25 years, who testified that, while Eklund did not have a long-term romantic relationship with anyone, he would pick people up, bring them to his home, and entertain them in his basement. The forensic pathologist who performed the autopsy on Eklund's body testified that hemorrhaging in the areas where Eklund's wrists were bound evidenced that Eklund was alive when he was tied up. The pathologist, Dr. Blum, saw evidence of internal bleeding in the area of Eklund's ribs and lower neck, but no evidence of rib fractures. While there was some bruising around the heart, Eklund's abdominal organs and intestines appeared normal. Similarly, there was no evidence of either injury to the brain or a skull fracture.

In Dr. Blum's opinion Eklund died as the result of manual strangulation due to bilateral compression of the neck resulting in asphyxia. He reached this conclusion because he found internal contusions, or bruises, on both sides of the victim's neck. The contusions, in turn, were associated with various injuries to the internal structures in the neck, including the injuries that led to Eklund's death. However, there were no marks on Eklund's neck that were consistent with pressure having been applied by fingers and thumbs or by the use of a ligature, *i.e.*, a rope-like object used to tie something up. The witness testified, though, that external bruising is not always present in cases of manual strangulation. Dr. Blum acknowledged that a blow, kick, or punch to the neck area could have damaged the internal structures of the neck and caused strangulation, although it would have taken considerable force.

The State argued that defendant choked Eklund to death after tying him up, while defense counsel submitted that defendant, who was reacting to Eklund's homosexual assault, had only hit the victim with his fists and that one such blow to Eklund's neck or throat had caused his death. The jury, which was instructed on second-degree murder and involuntary manslaughter as lesser included offenses of first-degree murder, found defendant guilty of second-degree murder.

At the sentencing hearing, Paula McNulty, the defendant's ex-wife, testified in aggravation that the defendant had beaten her during their marriage. McNulty also claimed that the defendant did not like homosexuals and would verbally express his feelings about them. She claimed defendant told her that, before he met her, he used to go into the Seventh Avenue area of Rockford and walk the streets on a regular basis. When homosexuals picked him up, he would wait until they made advances toward him and then would beat them up and take their money.

On his own behalf the defendant made the following statements:

"I want to express how very sorry I am about Randall Eklund's death. I am really very sorry that Eklund died. It was an incident that I wish would not have happened. I didn't mean for it to happen. I surely never intended for him to die.

It's going to be something that's going to be with me and haunt me for the rest of my life. I'm sorry beyond words about the man's death.

I also need to extend my deepest apologies if he has any loved ones, anybody that will miss him, because I have loved ones, and if I lost anyone I would grieve. I would grieve just like anyone else, so I know that this is, you know, hard on everybody."

Before announcing sentence the trial court observed that, by its verdict, the jury indicated its essential belief in defendant's version of the incident. The court went on to say that, even accepting the defendant's version, it found the facts "particularly egregious." The court then focused on the facts that defendant pursued Eklund both times he tried to get away and tied up the victim even after he had been knocked to the floor and was no longer a threat. Most particularly, the court emphasized that defendant left a bound and bleeding, helpless victim to die, not knowing whether it would take minutes or hours or days or whether any one else would come to his aid, and never went back to check on his condition, even though he had time to think about it while he stole some of the victim's belongings. This last factor, along with defendant's decision to flee the jurisdiction rather than surrender, led the trial court to conclude that defendant showed no remorse at the time of the offense. The court concluded

that the defendant's conduct was exceptionally brutal and heinous and indicative of wanton cruelty.

In considering matters in aggravation, the court highlighted defendant's criminal history: Florida convictions in 1985 of aggravated battery and resisting a police officer, in 1986 of aggravated child abuse and disorderly conduct, in 1988 of grand theft and resisting a police officer with violence; and Illinois convictions of unlawful use of a weapon, battery, and obstructing a police officer, prior to his present conviction of second-degree murder. After further finding that there was a need to deter like attacks against homosexuals and to protect the public, the court sentenced defendant to a maximum extended term of 30 years in prison.

Defendant contends the trial court abused its discretion when it prescribed such a severe sentence for his offense. The defendant was convicted of second-degree murder, a Class 1 felony (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(d) (now 720 ILCS 5/9—2(d) (West 1992))), with a usual sentencing range of 4 to 15 years (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(4) (now 730 ILCS 5/5—8—1(a)(4) (West 1992))). The trial court, however, found that defendant qualified for an extended-term sentence pursuant to section 5—5—3.2(b)(2) of the Unified Code of Corrections (Code), which provides for such sentences when, among other things:

> "[A] defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty ***." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2) (now 730 ILCS 5/5—5—3.2(b)(2) (West 1992)).)

Defendant was sentenced to the maximum of the 15- to 30-year-extended-sentencing range available for a Class 1 felony (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2(a)(3) (now 730 ILCS 5/5—8—2(a)(3) (West 1992))). An abuse of discretion standard is used to determine whether the trial court properly found a defendant eligible for an extended-term sentence under section 5—5—3.2(b)(2) of the Code. (*People v. Andrews* (1989), 132 Ill. 2d 451, 464.) The question raised then is whether, on the facts of this case, the trial court was warranted in concluding that the killing of Randy Eklund was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty on the part of the defendant. We do not think so.

The aggravating factor of brutal and heinous behavior has been given a narrow construction. (See *People v. Lindsay* (1993), 247 Ill. App. 3d 518, 531.) Our supreme court has defined " '[h]einous' " as " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal' "; and has indicated that "brutal" includes " 'grossly

ruthless,' " " 'devoid of mercy or compassion: cruel and cold-blooded.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, quoting Webster's Third New International Dictionary 1050, 286 (1971).) While *La Pointe* did not involve the statute at issue in this case, its definitions were extended to section 5—5—3.2(b)(2) in *People v. Andrews* (1989), 132 Ill. 2d 451, since the statutory language relevant to the respective cases was identical. Also indicative of the narrow construction given the statute is the supreme court's observation that the provisions for extended terms were " 'not intended to convert every offense into an extraordinary offense subject to an extended-term sentence.' " (*Andrews*, 132 Ill. 2d at 466, quoting *People v. Evans* (1981), 87 Ill. 2d 77, 88-89.) On the contrary, section 5—5—3.2(b)(2) requires that an offense be " 'exceptionally' " brutal or heinous. (*Andrews*, 132 Ill. 2d at 466.) Distinguishing between brutal and heinous conduct and that which is "exceptionally" so is a particularly difficult task. See *Lindsay*, 247 Ill. App. 3d at 532.

Cases where brutal or heinous behavior has been found frequently involve prolonged pain, torture, or premeditation. (*People v. Lucas* (1989), 132 Ill. 2d 399, 445.) Like *La Pointe, Lucas* did not concern section 5—5—3.2(b)(2), the statute at issue here. However, as did the *Andrews* court, *Lucas* invoked *La Pointe* because the statutory language involved was identical. Accordingly, we find *Lucas* helpful here. As examples demonstrating brutal or heinous behavior the *Lucas* court cited *People v. Odle* (1988), 128 Ill. 2d 111 (defendant strangled his 11-year-old brother with his hands and, when his hands became tired, finished murdering him by tying a pajama bottom around his neck until it was compressed to the size of an adult man's wrist), and *People v. Mitchell* (1984), 105 Ill. 2d 1 (defendant repeatedly beat a 16-month-old child with her hands, fists, and belt, standing the child back up to hit her again each time the child fell). Other cases illustrating exceptionally brutal or heinous behavior include *La Pointe* (the shooting of an unarmed taxicab driver was premeditated, and defendant showed a callous attitude and lack of remorse after the crime); *People v. Ratzke* (1993), 253 Ill. App. 3d 1054 (victim shot, then run down by a car as he tried to flee, and left in roadway where he was accidentally struck by another car); *People v. Bliey* (1992), 232 Ill. App. 3d 606, 622 (defendant "casually and methodically" shot murder victim twice at close range with a shotgun, shot another individual in the face with a handgun, and returned to shoot murder victim twice more with the shotgun); *People v. Diamond* (1992), 229 Ill. App. 3d 48, 53 (defendant encouraged a friend to stab the victim with a knife and directed another individual to block the victim's escape; when the friend walked away, the defen-

dant grabbed the knife and stabbed the victim, saying later, "[i]t was the first one and it felt good"); and *People v. Hickman* (1986), 143 Ill. App. 3d 195 (crime was premeditated and defendant subsequently lacked any penitent spirit).

In contrast to the cases just described, "exceptionally brutal and heinous behavior indicative of wanton cruelty" was not found in *Lucas*, where the defendant shook a seven-month-old infant and banged it against the side of its crib, causing severe injuries. Although a ruptured liver would otherwise have been fatal, the actual cause of death was suffocation, which occurred after the injuries. The court noted that the infant died almost immediately after being injured and that the injuries could have been inflicted by a single blow. Absent evidence that the death was premeditated, prolonged, or tortuous, the circumstances surrounding the death did not amount to the brutal or heinous behavior and wanton cruelty encompassed by the statute, and the defendant's death sentence was reversed.

The requisite brutal or heinous conduct was not found, either, in *Andrews*, where the defendant got into the passenger side of a car stopped at a traffic signal and pointed a gun at the unarmed, teenage driver and passenger. Although told by the victims they would give him what he wanted, and absent any provocation, defendant shot and killed the driver, hit the passenger in the eye with his gun, took her money, and fled. The State argued that defendant, who was convicted of first-degree murder, was properly given an extended term because his act of shooting a defenseless victim was cruel and cold-blooded where he could have achieved his goal without killing the victim and where defendant's conduct immediately following the shooting showed his callous disregard for the life he had taken.

While the *Andrews* court acknowledged the State's arguments, it pointed out that every murder is by nature unnecessary and that section 5—5—3.2(b)(2) required that the murder be " 'exceptionally' " brutal or heinous. The court then stated:

> "All murders are brutal and heinous to a certain degree. Moreover, many murdered robbery victims are defenseless when killed." (*Andrews*, 132 Ill. 2d at 466.)

The *Andrews* court further observed that there was evidence of neither premeditation nor a complete lack of remorse or callous attitude on defendant's part following the murder. In fact, the defendant had indicated his remorse at the sentencing hearing. The court held that the trial court had abused its discretion in sentencing defendant to an extended term.

Relying significantly on *Andrews*, this court also recently overturned an extended-term sentence which had been imposed on

the basis of brutal and heinous behavior. In *People v. Lindsay* (1993), 247 Ill. App. 3d 518, the defendant became embroiled in a struggle with the victim following an act of prostitution which had been solicited by the victim. Defendant tightened an electrical cord around her neck. When he loosened the cord, the victim again began to struggle, so he tightened the cord once more, strangling her. Although the victim became limp she continued to make noises, so defendant wrapped tape across her nose and mouth. He then dragged the victim down a flight of steps, placed her body in a garbage cart, and dumped it into a manhole. He did not know whether she was alive or dead. The jury convicted defendant of second-degree murder, finding that, at the time of the murder, he acted under the unreasonable belief that his conduct was necessary as self-defense. Like defendant in this case, the defendant in *Lindsay* was sentenced to a maximum extended term of 30 years' imprisonment following the trial court's finding that the offense was accompanied by brutal or heinous behavior indicative of wanton cruelty.

Upon review, we concluded that defendant's offense in *Lindsay* had not been accompanied by the *exceptionally* brutal and heinous conduct which would make an extended term applicable. Recognizing the jury's finding that defendant acted under the unreasonable belief in a need for self-defense, we first determined that the acts of strangulation, standing alone, were not enough to warrant the conclusion that defendant acted with wanton cruelty. We next noted that the tape was placed over the victim's mouth and nose, possibly assuring that she would not survive, at or very near the time of her death. Thus, we found no prolonged torture or extraordinary gratuitous pain. Finally, we focused on what we perceived as the most difficult consideration: the conscious indifference displayed by defendant when he taped the victim's face and dumped her into the manhole, not knowing if she was dead or alive, even after the acts of strangulation had been completed and the victim was subdued and helpless.

Citing *Andrews*, we observed that indifference to the survival of the victim is inherent in the crime of murder and the "left for dead" factor, therefore, did not support a finding of sufficiently brutal and heinous conduct to invoke the statute. Expanding on this concept, we stressed that, even though *Andrews* was a first-degree murder case in which the defendant had showed conscious disregard for the life of a defenseless victim, the court did not find a sufficient basis for an extended term. In light of *Andrews*, we found in *Lindsay* that the disregard for the life of the victim in the matter before us, which was only a second-degree murder case, did not support an extended term, either.

Upon application of the principles underlying the cases we have discussed, we conclude that the extended term imposed on defendant here reflects an abuse of discretion. To begin, there was no indication that the offense was premeditated. Although defendant was charged with first-degree murder, the jury found him guilty only of second-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—2 (now 720 ILCS 5/9—2 (West 1992))). The statute provides in relevant part:

"A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed *** or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles [of self-defense] *** but his belief is unreasonable." (Ill. Rev. Stat. 1989, ch. 38, pars. 9—2(a)(1), (a)(2) (now 720 ILCS 5/9—2(a)(1), (a)(2) (West 1992)).)

While the jury was instructed on both forms of second-degree murder, the verdict form it signed simply referred to second-degree murder and did not reveal whether the jurors found defendant acted with intense passion, an unreasonable belief that deadly force was permissible under the circumstances, or both. However, either factor would indicate that the jury rejected any suggestion that defendant acted with premeditation, and properly so. While the State presented evidence consistent with first-degree murder, there was no evidence that the killing itself was premeditated. At best the State's evidence at the sentencing hearing tended to show that defendant may have set up the victim, intending to beat and rob him. It did not show that defendant planned to kill Eklund. Too, defendant testified that when he left Eklund's house, he did not think he had killed him at all. Hence, premeditation is not available for purposes of determining whether defendant's conduct was brutal and heinous.

In a similar vein, although the trial court specifically found that defendant did not show any remorse at the time of the offense, at his sentencing hearing defendant clearly expressed deep regret and sorrow for what had happened to Eklund. The *Andrews* court found precisely such an expression inconsistent with exceptionally brutal and heinous behavior. We do, too.

With regard to the nature of the victim's death, no evidence was presented as to the time of death, or as to the lapse of time between the acts causing the compression of his neck and actual death. The forensic pathologist testified he found fluid in Eklund's lungs. He

explained that such a situation can occur when death is not immediate but there has been a prolonged period before the person actually dies from his injuries. However, the amount of fluid found was only moderate, and Dr. Blum neither defined what he meant by "prolonged" nor offered any other opinion as to how long Eklund may have lived after his neck was compressed. Moreover, the injuries to Eklund were consistent with his having been in a fist fight. According to the pathologist, the bruises on Eklund's body could have resulted from being struck with a fist. Likewise, his neck could have been damaged internally from a blow to the neck. Except for some internal bleeding, Eklund's internal organs, brain, and skull had not sustained injury. Finally, there was evidence that the injuries resulting in death could have been the result of a single blow. All in all, there is no support here for finding torture or prolonged or gratuitous pain. See *Lindsay*, 247 Ill. App. 3d at 533.

As a final matter, we consider the defendant's behavior at the time of the killing. We note initially that, given its verdict, the jury concluded that defendant acted either under an intense passion or under the unreasonable belief in the need for self-defense. In *Lindsay*, we cited *Evans* (87 Ill. 2d at 88) for the proposition that one who kills under a genuine although unreasonable belief in the need for self-defense cannot be said, on this basis alone, to have acted with wanton cruelty. (See *Lindsay*, 247 Ill. App. 3d at 533.) Similarly, we do not think wanton cruelty is at work when one is acting under a sudden and intense passion resulting from provocation by the individual killed. Consequently, we believe here, as we did in *Lindsay*, that no matter what precise acts of defendant caused Eklund's death, those acts, standing alone, did not rise to the level of wanton cruelty.

As for defendant's behavior throughout the incident and its aftermath, the trial court stressed that defendant pursued Eklund when he tried to get away, tied him up after he was bleeding profusely and no longer a threat, and left him to die. However, the jury must have concluded that the fight began when defendant reacted to the homosexual assault and threats made by Eklund, by far the bigger of the two men. Then, during the fight, Eklund shoved defendant down the stairs. Under the circumstances, it is not surprising that defendant pursued the escaping Eklund. Considering Eklund's greater size, and the turmoil which inevitably characterizes such physical confrontations, it is not surprising, either, that defendant may have perceived Eklund as a continuing threat even though he was bleeding about the face. Defendant could have decided that, once he got Eklund down on the floor, it was necessary to tie him up in order to keep him down.

The trial court was also clearly of the opinion that defendant left a helpless victim to die. However, as we said in *Lindsay*, indifference or hostility to the survival of the victim is inherent in the crime of murder. (*Lindsay*, 247 Ill. App. 3d at 534, citing *Andrews*, 132 Ill. 2d at 465-66.) Therefore, we are not persuaded that this factor necessarily supports a finding of exceptionally brutal or heinous behavior. More compelling in this case, however, is evidence that defendant did not leave the victim to die.

At the very least, the fact that defendant tied Eklund up is consistent with his claim that he did not think he had fatally injured Eklund. There would be no reason to bind a dead or dying victim. But in addition, defendant admitted hitting Eklund all over his face, head, neck, and chest. He claimed he hit Eklund, however, only with his fists. The evidence was consistent with this testimony in that there was no evidence that a weapon was used, and, according to Dr. Blum, Eklund suffered little injury to his internal organs and the bruises on his body could have been from a punch with a fist. Thus, despite the fact that Eklund was bleeding, defendant had no compelling reason to conclude that he was seriously, much less fatally, injured. It would have been reasonable under the circumstances to tie up Eklund to prevent any further altercation. All things considered, that defendant tied up and left Eklund appears to be more consistent with his testimony that he thought Eklund was okay than it is with the possibility that defendant tied him up and knowingly and deliberately left him to die. This conclusion is also consistent with the jury's verdict. Had the jury found that defendant injured and tied Eklund and then intentionally left him, fully expecting that he would die, defendant most likely would have been convicted of first-degree murder.

Not mentioned by the trial court, of course, was defendant's testimony that, when he heard Eklund making a gurgling sound, he turned him over onto his stomach to prevent him from choking. It is noteworthy that the State did not dispute this evidence. It would seem that a defendant acting with wanton cruelty toward his victim would not bother to go to the aid of that victim.

To summarize, while we find defendant's general behavior toward Eklund distinctly repellent, we do not believe it reflects the exceptionally brutal and heinous behavior contemplated by the statute. We therefore hold that the trial court abused its discretion in imposing an extended sentence. Pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we reverse the order of the trial court imposing an extended-term sentence and reduce defendant's sentence to 15 years' imprisonment, the maximum for second-degree

murder. As defendant does not appeal his conviction of second-degree murder, that conviction is affirmed.

Affirmed as modified.

QUETSCH, J., concurs.

PRESIDING JUSTICE INGLIS, dissenting:
I respectfully dissent.
I disagree with the majority's holding that the trial judge abused his discretion in finding that the murder in this case was accompanied by exceptionally brutal or heinous behavior warranting an extended sentence. The majority's reliance on *People v. Lindsay* (1993), 247 Ill. App. 3d 518, although technically accurate, is in my considered opinion wrong. If any crime warranted an extended sentence, such was the crime in *Lindsay*. I agree with the dissent. *Lindsay*, 247 Ill. App. 3d at 537 (Doyle, J., dissenting).

As that dissent notes, the evaluation of the heinousness and brutality of an offense requires analysis of the entire spectrum of facts surrounding the incident. (*Lindsay*, 247 Ill. App. 3d at 537 (Doyle, J., dissenting), citing *People v. Grady* (1982), 107 Ill. App. 3d 970, 977.) Defendant's actions, luring the victim into a situation wherein defendant could beat him up and rob him; beating him into flight and then pursuing him to beat him senseless; binding him hand and foot so as to pillage his home; and leaving him to die in a pool of his own blood or vomit, should stand as textbook examples of what is hateful or shockingly evil, grossly bad, enormously and flagrantly criminal, devoid of mercy and compassion, cruel and cold-blooded. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501.) These actions do not rise to the level of monstrous brutality in *Lindsay*, repeated strangulation with an electrical cord; taping shut the victim's mouth and nose; encasing the victim's head in plastic; and entombing the victim in a sewer; but *Lindsay* was wrong. There, as here, the crime was excessively brutal and heinous, warranting an extended sentence.

"Heinous or brutal behavior toward the victim can occur even after the victim is dead." (*Lindsay*, 247 Ill. App. 3d at 537 (Doyle, J., dissenting), citing *People v. Devine* (1981), 98 Ill. App. 3d 914, 925.) Defendant's cold-blooded lack of compassion echoed in his flight from justice and in his statement shortly after he left defendant, that he "robbed a faggot and beat the guy up and tied him up and left him in the house." The majority places itself in the position of the trier of fact, finding from defendant's unsworn statement that he had

644

remorse. The trial court, however, heard defendant's statement and had the opportunity to evaluate the timbre of the voice and the genuineness of the man. We cannot know by reading them in the record whether the words were hollow or sincere. The trial court also found that defendant's extensive and violent criminal history and the need to deter future crimes of this nature necessitated lengthy imprisonment of defendant for the protection of society. I agree.

The *Lindsay* case, if extended, will serve to eviscerate extended sentencing step by step. Today's crime must "beat" yesterday's crime, and tomorrow's must be worse than today's, in order to merit extended sentences. The fundamental rule of statutory construction is to give effect to the intent of the legislature. (*State v. Mikusch* (1990), 138 Ill. 2d 242, 247.) The majority opinion in this case fails to give effect to the statute. I therefore dissent.