THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES NELSON, Defendant-Appellant.

First District (6th Division)   No. 1—89—0694

Opinion filed April 12, 1991.

Michael J. Pelletier and Anne Meyer, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Walter P. Hehner, and Caren Ambrust, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Following a bench trial the defendant, James Nelson, was convicted of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and sentenced to natural life imprisonment. On appeal he contends (1) that the trial court erred in finding that his conduct was exceptionally brutal or heinous as defined under section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(b)); (2) that the trial court abused its discretion in sentencing him to natural life imprisonment; and (3) that he was denied his right to an impartial judge at his post-trial motion and sentencing hearings.

On December 15, 1986, 16-year-old Nathaniel Perry was staying at his mother's apartment at 6215 South Wabash in Chicago, Illinois, while she was away. About 12:30 p.m. Robert Perry, Michael Ruth, Kenneth Brewer and Steven Perkins, other teenagers, were also present. Nathaniel's mother was married to defendant, but she testified that she had been separated from the defendant for about three weeks before the incident, although he still had a key to the apartment.

Robert Perry, the brother of Nathaniel, testified that he left the apartment about 12:45 p.m. to go to the store. He returned 30 minutes later. Michael Ruth and Steven Perkins testified that at about 1 p.m. someone banged on the apartment door. Nathaniel looked out the peephole and announced that the defendant, who was his stepfather, was at the door with a gun and that everyone should hide. Kenneth Brewer was playing music in a bedroom at this time. Michael Ruth stated that he went into another bedroom and heard someone enter the apartment. From his hiding place under the bed Ruth saw feet, legs and a gun go past the bedroom. Michael Ruth then heard the defendant say, "Come out from there," and ask where his car was. Ruth heard Nathaniel reply, "I don't know nothing about your car." The defendant then accused Nathaniel of stealing the car. The defendant told Nathaniel to find out who stole the car. Nathaniel stated that he did not know. Michael Ruth testified that he heard defendant say, "I am fixing to blow your brains out." After hearing a gunshot, Ruth ran out of the apartment and called the police. Ruth stated that the music was turned off before defendant entered the apartment.

Steven Perkins testified that he ran into the bedroom where Kenneth Brewer had been playing records. Perkins saw Nathaniel Perry run into the bedroom of his sister, Patrice Perry. Perkins and

Brewer hid in the closet and closed the bedroom door because the closet did not have a door. Both Perkins and Brewer testified that when the door to the bedroom was opened, they saw defendant with a gun in his hand.

Kenneth Brewer heard defendant say, "Where are you?" and then accuse Nathaniel Perry of stealing defendant's car. Brewer testified that defendant said "Why are you talking this way? You know I am going to blow your head off." Brewer heard Nathaniel respond, "If that's what is going to happen, its going to happen." Steven Perkins testified that he heard the same conversation and saw defendant and Nathaniel facing each other. Brewer heard a shot and glass breaking, while Perkins saw defendant point the gun at Nathaniel's face and shoot him. Perkins testified that at the time he was shot, Nathaniel's hands were at his side and he never made a quick movement. Perkins saw defendant kick Nathaniel's feet after shooting him.

Kenneth Brewer testified that once he heard defendant leave the apartment, he locked the door and watched defendant through the kitchen window as defendant entered apartment 907. Brewer further testified that defendant was "smiling, laughing like it was a joke" when the police took defendant out of the apartment building. Brewer yelled at defendant, and defendant threatened Brewer by saying that if defendant had caught Brewer, Brewer would be dead, too.

Robert Perry testified that when he returned to the apartment from the store, he found Nathaniel shot through the eye and lying on the bedroom floor. Robert Perry also testified that several days before the shooting he informed defendant that Nathaniel would be staying at the apartment while his mother was out of town.

Chicago police sergeant John Kelly testified that he investigated the shooting and saw Nathaniel Perry's body, which appeared to have sustained a shot in the eye. Kelly testified that he was informed that defendant shot Perry and was in apartment 907. When Sergeant Kelly went to the apartment, he found defendant sitting on a kitchen chair underneath which was a pistol. Kelly advised defendant of his *Miranda* rights, and defendant responded by saying, "Is that sucker still alive, is he dead yet?" Kelly further testified that defendant said, "I don't want to go through this business for nothing. I did society a favor by killing him and getting him off the block." Kelly also testified that defendant appeared to have been drinking.

Officer John Blackman accompanied Kelly to apartment 907, and

he testified that he found defendant sitting on a kitchen chair. Blackman recovered a five-shot, .38 caliber gun from underneath the defendant's chair. The gun had four live rounds and one empty chamber. After defendant was advised of his rights, Blackman heard defendant say, "I know all of that shit; business is business; hell, I done the community a favor by killing him."

Officer Charles Cleveland testified that he searched defendant in the interview room at the police station. During the search an expended shell case fell from the defendant's pants, and defendant put the casing into his mouth and attempted to swallow it. Officer Cleveland, however, was able to recover the casing from defendant's mouth.

The State and the defendant stipulated that Dr. Korpics pronounced Nathaniel Perry dead at 1:56 p.m. on December 15, 1986. The parties also stipulated that Dr. Awn did the post-mortem examination of Perry and the medical examiner's report indicated that the cause of Perry's death was a gunshot wound to the face, lacerating the brain. It was also stipulated that Richard Chenow, a firearms examiner for the Chicago police department, examined the bullet removed from Nathaniel Perry's body and found that it was not suitable for comparison.

After the trial court denied defendant's motion for a directed finding, defendant testified. Defendant stated that he was 37 years old, graduated from high school, worked as an accounting clerk for three years, then did a four-year boilermaker apprenticeship to qualify for his present occupation as a boilermaker. Defendant testified that he lost an eye in 1975 as a result of being struck by a pipe. Defendant testified that he married Teresa Perry in August 1984 and had disagreements with her son, Nathaniel Perry.

Defendant testified that on December 15, 1986, he had three or four shots of whiskey and a beer with friends and then went home. Defendant stated that he was not intoxicated. Defendant denied knocking on the door of the apartment because he lived there and had a key. Defendant testified that his purpose in going to the apartment was to see if Robert Perry went to school that day. Defendant admitted that he had a gun, but maintained that it was in his pocket. Defendant testified that after entering the apartment, he walked into a bedroom, heard something behind him, pulled out the pistol, turned around, saw a figure and fired over his shoulder. Defendant stated that he was not looking for Nathaniel Perry and never intended to kill him. Defendant claimed that he did not recognize the person before shooting his gun, but when he saw who it

was, defendant went to his friend's apartment to call for help. There he put the gun on the floor and sat down.

On cross-examination, defendant could not recall what he said to the police, but remembered asking if Nathaniel was alive. Defendant admitted that he may have said, "he didn't want to go through this for nothing," but the police took the statement out of context. While defendant admitted putting the shell casing in his mouth, he said that he took it from his coat pocket. Defendant testified that it was inconceivable that another family member could be in Patrice's bedroom, and he just fired at a silhouette. In response to a question by the court, defendant stated that he walked to the apartment because his car was in the auto pound.

The State and defendant stipulated that if Chicago police officers Morrissey and Zigler were called to testify, they would state that they interviewed Michael Ruth, Kenneth Brewer and Steven Perkins shortly after the shooting. Morrissey and Zigler would testify that their police reports did not indicate that Michael Ruth heard the conversation between defendant and Perry regarding the stolen car or that Ruth saw defendant with a gun. The officers' reports also did not indicate that Kenneth Brewer heard defendant say "where are you?" two times, saw defendant with a gun or confronted defendant outside the building when defendant was arrested. The officers' reports did not reveal that Steven Perkins heard the defendant say "where are you?" or saw defendant with a gun in his hand.

At the conclusion of all the evidence, the court found that the three young witnesses for the State were convincing and it did not believe defendant's story. Specifically, the court determined that the defendant confronted Nathaniel Perry after defendant knew his car was in the auto pound and the homicide occurred as the State's witnesses testified. The court believed Kenneth Brewer's statement about the confrontation after defendant's arrest and found defendant's statements to the police officers were reprehensible and showed a malignant heart. The trial judge stated that defendant slanted his testimony in favor of a lesser charge, but the judge did not believe defendant's story. The court found defendant guilty of two counts of murder. Judgment was entered on both counts.

After trial, defendant alleged that he was denied effective assistance of counsel and an attorney from the Chicago Bar Association was appointed. At the post-trial motion hearing, defendant testified that his attorneys failed to conduct a reasonable investigation of certain facts for a defense and failed to raise the issue of self-defense.

Defendant said that the broken mirror was an alleged weapon. Defendant also testified that his attorney, Mr. Brownfield, was aware of the self-defense claim, but he was questioned by Ms. Lyon, another one of his attorneys, and she was unaware of this defense. Defendant also alleged that his attorneys failed to secure all statements of the State's potential witness, Treva Nelson, and were unable to prepare a proper defense. The court requested information on the two defense witnesses who would have sustained defendant's claim of self-defense, but defense counsel candidly stated that the one witness who was present to testify for defendant would not offer probative testimony on that point. The court also commented that based on defendant's testimony at the hearing, defendant had probably perjured himself by saying that he acted in self-defense.

Defendant stated that his wife was aware Nathaniel Perry was in the apartment on December 15, 1986. Moreover, defendant stated that his wife could have been impeached. Defendant told the court that his wife set up this whole "farce" and his stepson Nathaniel always brought difficulty to defendant's home. Defendant then alleged that his witnesses would testify that his wife lied when she said that she was out of town during the shooting while actually she was in Chicago setting this up, and that they had not been separated for three weeks. The court found that defendant's witnesses had no relevant testimony to offer on an ineffective-assistance-of-counsel claim. The court also concluded that all motions and memoranda filed by defendant were without merit and denied defendant's motion for a new trial.

The matter proceeded to a sentencing hearing. The court refused to look at the victim-impact statements. In aggravation, the State asserted that the facts of the case were brutal. The State also pointed out that this was a revenge killing, defendant had a lack of remorse throughout the proceedings and he did not help his stepson after shooting him. The State maintained that the defendant was eligible for an extended-term or natural life sentence because of the brutal and heinous nature of the crime. The State asked that defendant be sentenced to natural life.

In mitigation, Clementine White testified that she has known defendant for over 20 years, and he was a nice person who helped her out; she had never seen defendant do anything cruel or abusive. Ms. White was not aware of the facts of the present case. A letter from Mr. Black in support of defendant was submitted to the court, and the parties stipulated that Reverend Vance would testify that he had known defendant for years and considered defendant an up-

standing member of the community. He had no knowledge of the facts of the present case.

Defense counsel then argued that defendant had no prior criminal record and that the facts did not support a finding that the offense was accompanied by extremely brutal or heinous behavior or wanton cruelty. Defendant counsel requested that the court combine justice with mercy, reject the extended term and sentence defendant based on the lack of criminal record.

Defendant then stated that at the time of the shooting he was looking for a job. Defendant denied making the statement "[i]s that sucker dead?" to the police, and defendant expressed his sorrow that Nathaniel was dead. However, defendant persisted that his action was not intentional or premeditated, regardless of the contrary evidence.

Before imposing sentence, the court stated that it considered the evidence in the case, the presentence report, the factors in aggravation and mitigation, the sentencing alternatives and defendant's statement. The court stated that in order to sentence defendant to life imprisonment, it must find defendant's behavior was exceptionally brutal or heinous and indicative of wanton cruelty. The court then stated that it found defendant's conduct to be grossly ruthless, devoid of mercy or compassion and cruel and cold-blooded. The court stated that even after hearing factors in mitigation and the sentencing alternatives, the case warranted a sentence of life imprisonment without parole.

Defendant made a motion to reduce the sentence. After hearing defense counsel's argument, the court denied the motion and stated that it gave long and lengthy consideration to defendant's rehabilitative potential before imposing the sentence. The court stated that considering all the circumstances, defendant had not shown any rehabilitative potential. The court further found that defendant lacked remorse and would do whatever he wanted to at all times. The court also stated that defendant changed his story under oath and was incapable of telling the truth at any time during the proceedings.

The defendant first contends that the trial court erred in finding that his conduct was exceptionally brutal or heinous.

The imposition of a sentence is a matter of judicial discretion, and absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) If the trial court finds that a murder was accompanied by exceptionally brutal or heinous behavior

indicative of wanton cruelty, it may sentence the defendant to a term of natural life imprisonment. Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(b).

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, the court addressed the defendant's contention that the statutory language permitting the imposition of a natural life imprisonment sentence where conduct is "accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty" authorizes that sentence only if he had inflicted torture or unnecessary pain upon his victim. The supreme court found that the statute did not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain. The court, citing Webster's Third New International Dictionary, defined "heinous" as " 'hatefully or shockingly evil: grossly bad: enormously or flagrantly criminal' "; and defined "brutal" as " 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' " (*La Pointe*, 88 Ill. 2d at 501.) A single act which causes death or injury may be sufficient to demonstrate exceptionally brutal or heinous behavior. *People v. Taylor* (1987), 164 Ill. App. 3d 938, 943, 518 N.E.2d 409.

Both defendant and the State cite to many cases reversing or upholding life-term sentences. Although we are aware that the statutory sections allowing for life-term sentences were not intended to convert every murder conviction into an extraordinary offense subject to a life-term sentence (see *People v. Andrews* (1989), 132 Ill. 2d 451, 466, 548 N.E.2d 1025), absent a clear abuse of discretion, a trial court's decision regarding sentencing will not be disturbed on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) We are unable to conclude that a life-term sentence in the present case was an abuse of discretion.

In *Andrews* the court found an abuse of discretion where, although the victim and the defendant were strangers to each other and the murder occurred during an armed robbery, even though the victim was cooperative and acceding to defendant's demands, at sentencing defendant expressed sincere remorse and sorrow.

In his petition for rehearing, defendant cites the cases of *People v. Anderson* (1990), 201 Ill. App. 3d 75, 559 N.E.2d 267, and *People v. Hernandez* (1990), 204 Ill. App. 3d 732, 562 N.E.2d 219, for their analyses of the statutory language of section 5—8—1(a)(1)(b) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(b)), "exceptionally brutal or heinous behavior indicative of wanton cruelty" which would justify imposition of an extended-term sentence.

In *Anderson* the defendant and the victim were strangers to each other. When defendant tried to touch the victim around the waist, she pushed defendant to the floor and his gun fell out of his pocket. Allegedly, as they struggled for the gun, it discharged and the victim was shot twice in the neck. When apprehended, defendant admitted that he was involved in the shooting but contended that it was an accident. There were no eyewitnesses to the murder. In reviewing the extended-term sentence imposed by the trial court, the appellate court commented that the trial judge's comments at sentencing do not reflect a finding that the murder was exceptionally brutal or heinous and that the record does not support such a conclusion. The court found that the murder did not rise to the higher level of cruelty so as to warrant imposition of an extended-term sentence. *Anderson*, 201 Ill. App. 3d at 80.

The *Hernandez* case is factually different from *Anderson* in every respect. The defendant and the victim had a sexual relationship for five or six years prior to the murder and had a child together. They separated approximately six months prior to the murder but continued to see each other. Two days before the murder, the victim acknowledged to defendant her involvement with another man. On the day of the murder, defendant determined the other man's address, went to the apartment, picked up a pipe "for protection," listened at the door of the apartment and, upon hearing the victim's voice, broke through the door. The victim ordered the defendant out of the apartment, whereupon defendant punched her in the face. A struggle ensued and defendant used a pair of scissors from the apartment to stab the victim in the face, eyes, neck and chest, and by his own statement to the police, he "just kept stabbing her and couldn't stop." (*Hernandez*, 204 Ill. App. 3d at 743.) The trial court rejected defendant's theory that he acted under sudden intense passion. The reviewing court agreed, concluding that defendant literally stalked the victim on the evening of the murder, that the record supported a conclusion that the murder was premeditated and that the "manner in which [the victim's] death was accomplished stands virtually as a definition of the phrase 'exceptionally brutal or heinous behavior indicative of wanton cruelty' which far outweighs the mitigating factors." (204 Ill. App. 3d at 743.) The reviewing court found the extended-term sentence imposed by the trial court was not excessive or an abuse of discretion even though defendant was a first-time offender and had entered a guilty plea to murder and attempted murder in exchange for the prosecution's nol-prossing of 14 other counts. *Hernandez*, 204 Ill. App. 3d at 739.

Somewhere between the two extremes of conduct in *Anderson* and *Hernandez* are other circumstances and conduct which fall within the definition of exceptionally brutal or heinous behavior indicative of wanton cruelty. We find the defendant's conduct here falls within the definition. The State argued this was a revenge killing and that there was a lack of remorse by defendant for his actions.

■ The evidence established the following facts: the victim was unarmed and defenseless and did not provoke defendant's behavior; the defendant accused the victim of stealing his car and announced "I am fixing to blow your brains out"; the defendant shot the victim, his 16-year-old stepson, once in the face at close range; after the victim fell, the defendant kicked him; he did not help his stepson but walked out of the apartment and when found was sitting in apartment 907 on a kitchen chair with his gun on the floor. When confronted by the police and advised of his *Miranda* rights, defendant stated, "Is the sucker *** dead yet? I did society a favor by killing him and getting him off the block." Based on these facts, including defendant's lack of remorse for his conduct, the trial court did not abuse its discretion in concluding that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. See *People v. Taylor* (1987), 164 Ill. App. 3d 938.

The defendant next contends that the trial court abused its discretion by ignoring his strong rehabilitative potential and sentencing him to life imprisonment.

A trial court's decision with respect to sentencing is entitled to great weight and deference. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344.) The trial court is in a superior position to tailor a sentence to the needs of each individual case. (*People v. Hicks* (1984), 101 Ill. 2d 366, 375, 462 N.E.2d 473.) Absent a clear abuse of discretion, a trial court's decision regarding sentencing may not be disturbed on review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.

■ At the sentencing hearing the court reviewed the presentence investigation report and made it part of the record. Defense counsel argued factors in mitigation and presented testimony in support of defendant's good character. Defendant made a statement in allocution, and the trial court indicated that it had considered those factors before imposing the sentence. Decisions have held that when mitigation evidence is before the trial court, there is a presumption that the court considered the evidence, absent some indication, other than the sentence imposed, to the contrary. *People v. Duncan* (1990),

196 Ill. App. 3d 343, 345, 553 N.E.2d 774; *People v. Goodman* (1983), 116 Ill. App. 3d 125, 127, 451 N.E.2d 607.

■ Even though this was defendant's first offense, the trial court determined that defendant's rehabilitative potential was minimal or nonexistent. This was based on the heinous nature of the offense and defendant's complete lack of remorse for his act. See *People v. Johnson* (1987), 159 Ill. App. 3d 991, 513 N.E.2d 852.

The defendant next argues that he was denied his right to an impartial judge at his post-trial motion and sentencing hearing. Defendant's argument is based on the fact that the trial court commented that defendant's claims at his motion for a new trial indicated that he perjured himself at trial and the trial court's emphasis on the heinous nature of the crime.

■ A defendant is entitled to have the issues in his case resolved by an open-minded, impartial judge who arrives at conclusions from a calm, unbiased consideration of the facts of the case. However, the mere expression by a judge of an opinion, or the fact that a judge has strong feelings on an issue, does not amount to bias or prejudice. (*People v. Hooper* (1989), 133 Ill. 2d 469, 513, 552 N.E.2d 684.) There must be an active personal animosity, hostility, ill will or distrust towards the defendant. *People v. Vance* (1979), 76 Ill. 2d 171, 390 N.E.2d 867.

The defendant testified at trial that the death of his stepson was an accident. At his hearing on his motion for a new sentence defendant alleged that counsel was ineffective for failing to call witnesses and should have raised the issue of self-defense. He also attempted to give the court irrelevant information to any self-defense claim.

■ Defendant based his claim that the trial court was biased against him on the fact that when he alleged ineffective assistance of counsel, the court commented that new counsel would be appointed for defendant because of a "very ridiculous appellate court case." In this respect, the case at bar is similar to *People v. Hooper* (1989), 133 Ill. 2d 469, 552 N.E.2d 684. In *Hooper*, prior to a *Batson* hearing, the trial court commented on the difficulties raised by *Batson*, its unhappiness with the decision, and its belief that part of the holding was unclear. (*Hooper*, 133 Ill. 2d at 512.) The defendant alleged that these comments proved that the judge was biased against him. (*Hooper*, 133 Ill. 2d at 512.) The Illinois Supreme Court determined that defendant failed to show actual prejudice by the court's statements. (*Hooper*, 133 Ill. 2d at 513.) Moreover, the court held that the fact the judge disagreed with the holding in *Batson*

did not mean that he was unwilling or unable to apply it to the case before him, and the judge stated he had no preconceived ideas about the case prior to hearing the argument of counsel. (*Hooper*, 133 Ill. 2d at 513-14.) Likewise, when the trial court in this case referred to a "ridiculous appellate court case," it did not reflect any bias it had against defendant, but only expressed a view of the law. The court never suggested that it would not follow the law.

Defendant cites *People v. Mac Rae* (1979), 78 Ill. App. 3d 266, 397 N.E.2d 509, for the proposition that hostility of a trial judge to an appellate court opinion suggests that the trial judge was biased. *Mac Rae* is inapplicable to the case at bar because it involved the rejection of the mandate from the appellate court in the same case. (*Mac Rae*, 78 Ill. App. 3d at 267.) The defendant in *Mac Rae* appealed his sentence and the appellate court remanded the case with instructions that the trial court consider probation as a possible sentence. The trial court's comments indicated that it rejected the appellate court's ruling and imposed the same sentence on the defendant. This is not the situation in the present case because the trial court did not have a mandate from a reviewing court ordering that new counsel be appointed for defendant. The comment the court made in this case made about the "ridiculous appellate court case" clearly does not demonstrate hostility towards defendant.

Defendant also contends that the impatient and abrupt attitude of the trial court, coupled with the persistent refusal to allow a full explanation of the post-trial motions, showed the court's hostility toward him. In support of this argument, defendant points out that during the sentencing hearing, the court accused defendant of perjuring himself and said that it should cite defendant for contempt. What defendant overlooks in this argument is that he attempted to give contradictory testimony, and the court commented on this. During trial, defendant testified that he did not see whom he was shooting and just shot at a silhouette. However, at the hearing on the post-trial motion, defendant testified that the issue of self-defense should have been raised and that his stepson intended to use the broken mirror as a weapon. That testimony is clearly at odds with defendant's earlier testimony. Furthermore, at the same hearing, defendant's attorney admitted that upon review of the transcript of the trial none of defendant's testimony resembled a basis for self-defense. Even defendant acknowledged at trial that his defense was that the shooting had been an accident.

■ Defendant argues that he did not change his defense theory because he gave notice of raising a self-defense claim both before

trial and in his post-trial motion. Defendant alleges that the trial court ignored this notice when it stated defendant should be cited for contempt. However, defendant fails to explain why, when questioned at trial, he did not testify that he saw his stepson threatening him with a broken mirror, but instead testified that he fired over his shoulder at a figure. The court's observation that defendant contradicted his earlier testimony does not demonstrate hostility, but rather the court made a correct assessment that defendant potentially perjured himself.

The trial court also did not display personal animosity toward defendant when it questioned defendant while defendant was giving the court background information on the new witnesses who could substantiate his claim of self-defense. A judge may act to clarify and expedite the questioning of a witness without prejudicing a defendant. (*People v. Wells* (1982), 106 Ill. App. 3d 1077, 1086-87, 436 N.E.2d 688.) Reversible error is committed only where it is shown the judge has made prejudicial statements and defendant can show that he has been harmed by the remarks of the judge. (*People v. Carrasquilla* (1988), 167 Ill. App. 3d 1069, 1079, 522 N.E.2d 139.) The questions the trial court asked defendant were designed to move the proceedings along and to get to the heart of the issue. When it became clear that defendant's new witnesses could only offer information on irrelevant issues, the court terminated defendant's testimony and ruled on the motions.

Finally, although the trial court made numerous references to the defendant's "black heart," the trial court stated that its disdain was based more on the facts of the case than on the defendant. We believe the comments were merely directed at the brutal and senseless nature of the case and defendant's total lack of remorse. We do not find that the trial court was biased against the defendant.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

EGAN and RAKOWSKI, JJ., concur.