THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW LINDSAY, Defendant-Appellant.

Second District   No. 2—91—0691

Opinion filed May 28, 1993.—Rehearing denied August 4, 1993.

DOYLE, J., dissenting.

G. Joseph Weller and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

A jury convicted defendant Andrew Lindsay of the second-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2)) of Judy North (the victim). The jury found by a preponderance of the evidence that, at the time defendant killed the victim by strangulation, he acted under the unreasonable belief that his conduct was necessary as self-defense (see Ill. Rev. Stat. 1989, ch. 38, pars. 9—2(a)(2), 7—1). The trial court sentenced defendant to an extended term of 30 years' imprisonment, the maximum for second-degree murder, based upon its finding that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.2(b)(2), 1005—8—2(3).

Defendant appeals his sentence, arguing that (1) the trial court abused its discretion in imposing the extended-term sentence, as the murder was not accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; and (2) the trial court gave inadequate consideration to defendant's rehabilitative potential.

Since the only issues raised in this case concern the sentence defendant received, only those facts relevant to the sentencing issues will be discussed in any great detail.

By way of background, it is undisputed that, on December 9, 1990, following an act of prostitution which the victim had solicited from the defendant, the defendant strangled the victim by pressing an electrical cord from his stereo against her neck. Defendant wrapped tape across the victim's nose and mouth, placed her body in his landlord's garbage cart and deposited the body in a manhole. We will now discuss the relevant trial testimony.

Dr. Eupil Choi, a certified forensic pathologist, testified about the autopsy and his findings therefrom. The victim was 5 feet 4 inches tall and weighed approximately 135 pounds. Upon viewing the victim, he noted that her nose and mouth were covered with brown surgical tape; her whole face was swollen with a purplish discoloration; and there were bands of discoloration on both sides of the front of her neck. The back of her neck was not discolored. There was a small cut just below her right eyebrow and bruising on the right side of her forehead. The victim had "hemorrhagic changes" in both eyes. There were several bruises on both arms and scrapings on both sides of her knees.

Dr. Choi summarized the results of the internal examination he performed on the victim. There were two areas of hemorrhage in the temple area, as well as soft tissue hemorrhage in the neck area, including the esophagus, the tongue and the front neck area. The neck bone known as the soft thyroid cartilage was fractured.

Dr. Choi opined to a reasonable degree of medical certainty that the victim's death was caused by strangulation. This opinion was based primarily on the purplish discoloration of her neck and face and the swelling of her face. The injury to the victim's right eyebrow was the only open wound that Dr. Choi discovered. The bruising on the victim's forehead indicated that she was in some way bumped at about the time she died.

Dr. Choi further testified that when he removed the tape from the victim's mouth, he found nothing else (such as a gag) in her mouth. Fluid was continuing to drain from the victim's mouth and nose. Dr. Choi could not be certain whether the tape was put on before or after the victim died. In general, strangulation of the type here causes death well within five minutes. However, a person could be alive after strangulation for some time. In such a case, blood draining from ruptured vessels could flow to the mouth and, if present in a sufficient amount, could suffocate the person. Under these circumstances, the tape over the victim's mouth could have contributed to her death. According to Dr. Choi's examination, the continuation of the fluid from the victim's mouth and nose was perimortem, i.e., it occurred around the time that the death occurred.

Defendant gave three differing versions of the events surrounding the victim's death. Prior to his trial, defendant first told police officers that after having sex with the victim, she asked him to go out and look for her girlfriend on Sheridan Road, which he did without success. As he was returning to his apartment, he noticed a black man putting a body in a hole in the alley in back of his apart-

ment building. As the defendant watched, the man ran west. Defendant went to the hole in the alley, and by the light of his cigarette lighter, he saw the victim's body in the hole; a cord and tape were wrapped around her neck. Near the hole was the defendant's landlord's garbage cart, containing a blue blanket. Defendant checked the body for a pulse and found none. He heard a noise of some sort and, fearing discovery, ran to his apartment, where he noticed that the lights and the television were on. Defendant asked his landlord to call the police; eventually, defendant got through to the police. Defendant then went to his apartment; afraid that the police might see his footprints at the scene, he removed his tennis shoes and threw them into the trash.

After further questioning by the police, defendant gave the following account. After defendant and the victim had sex, she asked him for $150 for her services. When he told her he did not have any money, she hit him. Defendant stood up on the couch; the victim kicked him in the testicles, knocking him to the floor, where she kicked him again.

The victim went to the bedroom and returned with a hammer. As defendant, still in a state of undress, tried to leave, she swung at him with the hammer twice. Both times she missed, but the second time she swung, she hit herself in the eye and fell. Defendant got on top of her to calm her down. The victim got up, struck him in the arm with the hammer and kept hitting him. She hit him in the testicles for the third time; he fell onto the floor and lay still.

As defendant lay on the floor, the victim tried to pull some rings off his fingers, but he pushed her aside. She grabbed a knife, swung at him but missed. Defendant threw her to the floor. Noticing an electrical cord lying on the floor, he wrapped it around the victim's neck. She tried to hit him, but soon her arms fell to her sides. Defendant then reached for the telephone to call for help; as he did so, the victim started to hit him again. The defendant put pressure on the cord that was still wrapped around the victim's neck. As she tried to get the cord off, defendant saw blood coming from her nose, and her arms went limp.

Defendant became afraid; he had not meant to kill the victim, only to make her unconscious. The victim was making noises; unable to stand the sound, defendant wrapped tape around her mouth. He checked for a pulse and found none. Scared, defendant dressed the victim and covered her with a blanket.

Defendant then went outside to find a place to put the victim. He saw the manhole and removed the cover. He went back to the

apartment and dragged the victim, who was too heavy to carry, down the back steps. Spotting the garbage cart, defendant put the victim in the cart with a piece of wood in the back to keep the body from falling out. When defendant saw a vehicle in the area, he ducked down, returned to the apartment and came back with a blue blanket and two clear plastic bags. Defendant put the bags around the victim's head, so as not to get blood on the blanket, covered the body with the blanket and pulled the cart down the alley to the open manhole. He put the victim in the manhole and put the piece of wood over the hole. Thinking he heard a noise, defendant ran back to his apartment with the blanket, plastic bags and the cart. He retrieved his tennis shoes, the spool of tape and a bandage from his apartment. He threw the tennis shoes in a trash can and the other items into a field. Later, he showed the police where he had put the items.

At trial defendant testified that prior to his arrest on the instant charge he had resided in North Chicago for about three months after completing his basic training in San Diego. Before enlisting in the Navy, he had lived in Beaver, Utah, with his wife and child. One week prior to the murder, his wife moved out because she was seeking a divorce. Defendant stated that he was 5 feet 9 inches tall and weighed about 130 pounds and that he had put on about 20 pounds since his arrest. Defendant then testified to the following version of the events surrounding the victim's death.

According to the defendant, when the victim first propositioned him, he told her he had no money and could offer her only food and a place to stay. They returned to defendant's apartment, where defendant fixed the victim a sandwich. Prior to the first act of sexual intercourse, defendant reminded the victim that he had no money, and the victim told him that it did not matter. However, after the second act of intercourse, the victim demanded a sum in excess of $100. When defendant reminded her that no money was to be involved, the victim became "really pissed off" and started hitting defendant's face with her hand. As defendant, who was naked, tried to grab her arms, the victim kneed him in the testicles. After he fell to the floor in intense pain, the victim kicked him in the ribs and groin.

While defendant lay on the floor, the victim left the room and returned with a hammer. Defendant went to the back door and stood by it. The victim swung the hammer at him but missed, knocking a hole in the bottom corner of the window portion of the door. The victim swung the hammer again; the defendant grabbed

her hands, and, although he did not see it, he believed that the hammer somehow hit the victim in her right eye, which began to bleed slightly. The struggle continued with the victim striking the defendant in the right shoulder with the hammer and again kicking him in the groin. Defendant lay on his side with his knees up unable to move his legs for 15 to 20 seconds.

The next thing defendant remembered was the victim trying to remove one of three gold rings he wore. Defendant pushed the victim into the kitchen. The victim picked up a steak knife with a blade 8 to 12 inches in length and told defendant she was going to kill him. As they struggled, the victim fell to the floor, dropping the knife, but she kept hitting the defendant. Defendant got on top of her, straddling her legs and struggling unsuccessfully to hold down her hands. It was then that he noticed that the cord to his stereo had become unplugged and was lying under the victim's head or neck. He placed it around the victim's neck and tightened it in an effort to stop her from hitting him, not to kill her.

The next thing he remembered was reaching for the telephone, although he did not know whom he would call. He loosened his grip on the cord; he did not think it was enough to choke the victim, although, as he recalled, the victim was gasping for air. As the victim began to hit him again, he tightened his grip on the cord. As before, he did not believe that tightening the cord would harm the victim. As the victim struggled to remove the cord, her face was red. She pushed him off her, and he loosened his grip on the cord. The victim did not move; defendant could not recall at trial whether her eyes were open.

Defendant looked at the victim for several minutes; he was frightened and did not know what to do. He could not tell if the victim was conscious. The victim was making noises "like a gasp for air"; however, he also stated that he "did not know what it sounded like." Defendant saw blood running from the victim's nose and, wanting to stop the flow, wrapped athletic tape around the victim's head, covering her nose. At the time he did it, defendant did not think that the tape would eliminate any chance the victim had of surviving. He had not checked for a pulse before applying the tape. Defendant did not tape the victim's mouth until after he took her from the apartment.

The defendant then got dressed. He checked the victim for a pulse and became scared when he found none. He did not know for sure at this point whether the victim was dead. He did not know what to do. Although he had a telephone in his apartment, it did

not occur to him to call the police or for an ambulance. He walked downstairs to the alley and removed the cover from the manhole although, according to defendant, he was not yet looking for a place to dispose of the victim's body. While standing in the manhole, he first thought of looking for a place outside of this apartment to put the victim. He still did not know if she was dead or alive. He still did not kno ⁄ if he should call the police.

Back in his apartment, defendant placed a plastic bag over the victim's face and a blanket over her. He placed the victim on the garbage cart and started pulling the cart. At some point he tried to take the tape off the victim's face, but he could not explain why he did so. When he placed the victim in the manhole, defendant still did not know whether she was alive or dead.

Upon returning to his apartment, defendant could not bring himself to call the police because he feared they would not believe the account of his fight with the victim. He threw his tennis shoes away because he was afraid the police would see the shoe prints around his apartment; he did not know why he threw the tape away.

Defendant could not explain why he used his landlord's telephone instead of his own to call the police. He thought up the burglary story which he told his landlord and repeated to the police. Because he wanted the police to find the victim, defendant urged them to inspect the manhole.

When cross-examined about the fight with the victim, defendant admitted that he did not suffer any bruises. Although at the beginning of the fight the victim was too strong for him to hold onto, he was able to get her down on the floor after she came at him with the knife. He admitted that he never shouted for help and never called the police or an ambulance until after the victim was in the manhole.

Ron Moss, a counselor at defendant's high school, testified that defendant had a reputation as a peaceable person. Brenda Geater, a longtime acquaintance of the victim's, testified to an incident in which she was physically attacked by the victim.

The parties stipulated to testimony that at the time of her death, the victim's blood-alcohol level was 0.193%, well above the 0.1 level at which intoxication is presumed under the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501) and that a blood sample from the victim revealed that she had ingested cocaine shortly before her death.

In rebuttal, there was testimony that the electrical cord recovered from defendant's apartment was tied at both ends.

The jury convicted defendant of second-degree murder. The cause proceeded to a sentencing hearing. The State urged the court to impose an extended-term sentence on the ground that the murder was accompanied by exceptionally brutal and heinous conduct indicative of wanton cruelty (see Ill. Rev. Stat. 1991, ch. 38, pars. 1005—5—3.2(b)(2), 1005—8—2(3)). The prosecution noted that defendant, by his own admission, put the victim into a sewer hole without seeking help, even though, at that point, he did not know whether she was still alive. Before removing her body, he failed to seek help even after she was gasping for air and was no longer a threat to defendant. The State maintained that this demonstrated defendant's lack of mercy or compassion.

In response, defense counsel maintained that, because the jury found by a preponderance of the evidence that defendant killed the victim out of a genuine although unreasonable belief in the need for self-defense, the trial court was barred from finding that the offense was accompanied by exceptionally brutal or heinous behavior. Defense counsel argued that defendant's reaction to what he had done showed no brutality or a lack of compassion, but the predictable panic of a young man, without a violent past, who killed the victim out of fear. Defense counsel also argued that, after defendant called the police, defendant led the police to the hole where he had buried the victim's body; this demonstrated that defendant felt at least some remorse over his conduct.

The trial court sentenced defendant to 30 years' imprisonment, the maximum under the extended-term provision. In explaining his decision, the judge noted that defendant had been dishonorably discharged from the Navy because of his antisocial personality and poor impulse control. Also, defendant had been subject to discipline several times while in jail pending trial and judgment. Moving to a discussion of the specific factors in aggravation (see Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2) the judge stated, in part:

"As to the question of extended term *** I find that this offense was brutal and heinous and indicative of wanton cruelty. *** [T]he jury has found there to be a mitigating factor of self-defense reducing this from first degree murder to second degree murder.

However, the following facts stand out loud and clear: First of all, that he strangled Judy North not once but twice. As she went unconscious after she was strangled the first

time and when she revived and regained consciousness, [defendant] strangled her again until he noticed that her arms dropped and she became limp. Then, after he had done this, *** he heard from her mouth a gasp of air, and notwithstanding that he heard a gasp of air, he gagged her. He taped her mouth and nose, which would have made completely impossible any chance that she would have survived.

Then *** not knowing if Judy were dead or alive, he proceeded to take her in her gagged state to a storm sewer *** and stuffed her in the storm sewer not knowing if she was dead or alive. He then covered up what he had done by making a false report to the North Chicago Police Department.

I do find the whole scenario involved here of strangling Judy North twice until her arms dropped limp to her side, and then, as she gasped for air, according to the defendant's own testimony, taping her mouth and nose, and then not knowing if she were alive or dead, taking her to a storm sewer, stuffing her into that sewer and leaving her unattended and unaided in that storm sewer, I do find all of that indicative of brutal and heinous conduct indicative of wanton cruelty."

Defendant appealed without moving at the trial level for reconsideration of the sentence. By failing to file a post-sentencing motion, defendant has waived his sentencing arguments on appeal. (*People v. Pasch* (1992), 152 Ill. 2d 133, 216; *People v. Fort* (1992), 229 Ill. App. 3d 336, 339-40; *People v. Macke* (1992), 224 Ill. App. 3d 815, 816.) However, we may, in our discretion, consider plain error or defects affecting substantial rights. 134 Ill. 2d R. 615(a).

We have held that the imposition of an extended-term sentence is reviewable as plain error. (*People v. Lighthall* (1988), 175 Ill. App. 3d 700, 705.) Here, the finding that defendant was eligible for an extended term affected substantial rights, as it enabled the court to impose a sentence twice the normal maximum. (See Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(4), 1005—8—2(a)(4).) Defendant's challenges to his sentence have merit. In the interests of justice, we disregard the waiver rule.

We first consider whether the trial court abused its discretion in imposing an extended term on the ground that the offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. Defendant's attack on this finding is two-pronged. He argues that (1) *People v. Evans* (1981), 87 Ill. 2d 73, forecloses any finding that a murder committed under an unreason-

able belief in the need for self-defense was accompanied by exceptionally brutal and heinous conduct; and (2) even if *Evans* establishes no such *per se* rule, the evidence was insufficient to show that defendant's crime was accompanied by exceptionally brutal and heinous conduct.

■ We do not agree that *Evans* forecloses a finding of exceptionally brutal or heinous· behavior in any case where the defendant has been convicted of second-degree murder based on an unreasonable belief in the need for self-defense. However, we agree with defendant that, under the facts of this case, the trial court abused its discretion in concluding that the defendant's actions were accompanied by exceptionally brutal and heinous conduct indicative of wanton cruelty. Therefore, we reverse the imposition of the extended-term sentence.

We first explain why we do not believe that a conviction of second-degree murder (formerly voluntary manslaughter) based on an unreasonable belief in self-defense is necessarily inconsistent with a finding of exceptionally brutal and heinous behavior. We begin with the relevant statutory language.

A defendant commits second-degree murder when he commits first-degree murder with a mitigating circumstance present, *e.g.*, "[a]*t the time of the killing*, he believes the circumstances to be such that, if they existed, would justify or exonerate the killing [as the use of force in defense of person], but his belief is unreasonable." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2); see Ill. Rev. Stat. 1989, ch. 38, par. 7—1.) A trial court may impose an extended-term sentence if it finds properly that "*the offense was accompanied by* exceptionally brutal or heinous behavior indicative of wanton cruelty." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2); see Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2.

The definition of second-degree murder focuses on the defendant's state of mind *at the time of the killing*. However, the statutory provision for aggravation instructs the sentencing court to consider whether the offense was *accompanied by* exceptionally brutal and heinous behavior. The former provision relates to the defendant's motivation or subjective belief at the time of the killing, but the latter enables the court to consider more than the act on which criminal liability is based. The sentencing judge is to consider the defendant's state of mind at all relevant times, including after the commission of the act making the offense complete. As one opinion states aptly, "in evaluating the brutality and heinousness of an of-

fense, the entire spectrum of facts surrounding the given incident must be analyzed and evaluated." *People v. Devine* (1981), 98 Ill. App. 3d 914, 925, *cert. denied* (1982), 458 U.S. 1109, 73 L. Ed. 2d 1371, 102 S. Ct. 3490; see also *People v. Smallwood* (1984), 102 Ill. 2d 190, 197; *People v. Jones* (1992), 236 Ill. App. 3d 244, 251; *People v. Grady* (1982), 107 Ill. App. 3d 970, 977; *People v. Schlemm* (1980), 82 Ill. App. 3d 639, 650-51.

Several cases illustrate that an offense may be accompanied by exceptionally brutal and heinous behavior even though a narrow focus on the commission of the offense itself would not necessarily disclose such behavior (or the wanton cruelty of which such behavior is indicative). In *Smallwood*, the defendant was convicted of two counts of armed robbery and one count of aggravated battery, receiving an extended sentence on the first armed robbery conviction. The trial court found that the armed robbery was accompanied by exceptionally brutal and heinous behavior, *i.e.*, the shooting of a victim whom the defendant had already robbed at gunpoint. The supreme court held that the trial court did not err in finding that the gratuitous shooting accompanied the armed robbery. The court observed that in many cases "the exceptionally brutal and heinous behavior necessary to authorize the imposition of an extended-term sentence will itself constitute another separate offense, as in this case." (*Smallwood*, 102 Ill. 2d at 195.) The court upheld the trial judge's finding of fact that the shooting accompanied the armed robbery, even though the armed robbery was complete before the shootings. *Smallwood*, 102 Ill. 2d at 196.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, the supreme court upheld a finding that the shooting of an unarmed taxicab driver was accompanied by exceptionally brutal and heinous behavior. The court emphasized not only that the offense was premeditated but also the defendant's callous attitude and lack of remorse after the crime. See also *People v. Nelson* (1991), 206 Ill. App. 3d 956, 965-66 (in finding that the murder of which defendant was convicted was accompanied by exceptionally brutal or heinous behavior, trial court properly considered that, after the defendant shot his 16-year-old stepson, the defendant kicked the victim, walked out of the apartment where the victim lay dying, and later told the police that he had done society a favor by killing the victim); *People v. Hickman* (1986), 143 Ill. App. 3d 195, 206 (noting that both defendant's premeditation and his subsequent lack of any penitent spirit supported the trial court's finding of exceptionally brutal and heinous behavior); *People v. Schlemm* (1980), 82 Ill. App. 3d 639 (concealment or

dismemberment of murder victims' corpses may constitute exceptionally brutal and heinous behavior).

Defendant argues, however, that *People v. Evans* (1981), 87 Ill. 2d 77, established a *per se* rule that a conviction of second-degree murder (then voluntary manslaughter) based on an unreasonable belief in the need for self-defense is legally inconsistent with a finding that the offense was accompanied by exceptionally brutal and heinous behavior. We do not read *Evans* so broadly. *Evans* does not negate the above-noted distinction between the defendant's mental state at the time of the killing and the totality of the circumstances surrounding the offense. Thus, *Evans* does not automatically shelter one who murders under an unreasonable belief in the need for self-defense from a finding that the murder he committed was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Rather, as we read *Evans*, that decision shelters only those of defendant's relevant actions that were in fact committed under a belief in the need for self-defense.

In *Evans*, the defendant was convicted of voluntary manslaughter based on an unreasonable belief in the need for self-defense. The defendant did not intend to shoot the victim (Wilson); rather, he killed Wilson with a stray bullet intended for a third person (Davenport) whom the defendant believed was a threat to his own bodily safety. In convicting the defendant of voluntary manslaughter, the jury found that this belief was genuine but objectively unreasonable. The trial court imposed an extended sentence, based on its finding of exceptionally brutal and heinous behavior indicative of wanton cruelty.

In disapproving the extended sentence, the supreme court held that the defendant's actions toward the victim were not indicative of wanton cruelty. Noting the defendant's subjective belief in the need to defend himself, the court stated that, "[i]nasmuch as Wilson was an unintended victim and none of Evans' actions were directed toward Wilson, *** the voluntary manslaughter offense was not accompanied by exceptionally brutal or heinous behavior indictive [*sic*] of wanton cruelty." (*Evans*, 87 Ill. 2d at 87.) Furthermore, the defendant could not be sentenced to an extended term for the aggravated battery against Davenport. The court explained:

> "In our opinion, actions committed under a subjective belief, albeit unreasonable, that the actions were in self-defense do not constitute wanton cruelty. As the appellate court noted, section 5—8—2 of the Unified Code of Corrections was not intended to convert every offense into an extraordinary

offense subject to an extended-term sentence. [Citation.] Because the evidence indicated that *all* Evans' actions toward Davenport were committed under the belief, although unreasonable, that he was acting in self-defense, we cannot say the aggravated battery offense was accompanied by wanton cruelty." (Emphasis in original.) *Evans*, 87 Ill. 2d at 88-89.

This language does not impose a blanket rule that offenses *motivated* by a perceived need for self-defense may never be *accompanied* by conduct indicative of wanton cruelty. The *Evans* outcome was fact-specific, as can be seen by the court's emphasis on the fact that *all* of the defendant's actions were done under the belief in the need for self-defense. Where all of a defendant's relevant actions must be so characterized, it follows logically that the trial court may not rely on any of the defendant's relevant actions to support a finding of exceptionally brutal and heinous behavior and, thus, that an extended-term sentence is not permissible on this ground. However, in a given case, it is not necessarily true that all of the defendant's relevant actions, whether before, during, or anytime after the murderous act, were committed under the belief in the need for self-defense.

We conclude that *Evans* does not establish a *per se* rule that a murder committed under the unreasonable belief in the need for self-defense cannot be accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. (See *People v. Chavez* (1992), 228 Ill. App. 3d 54.) We discuss now whether the trial court erred in finding that the murder in this case was accompanied by such behavior. Based on recent case law giving this aggravating factor a very narrow construction, we conclude that the extended sentence was an abuse of discretion.

Whether to impose an extended-term sentence based on a finding of exceptionally brutal and heinous behavior is committed to the discretion of the sentencing court. (*People v. Andrews* (1989), 132 Ill. 2d 451, 464; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153-54.) However, section 5—5—3.2(b)(2) of the Unified Code of Corrections was not intended to convert every offense into an extraordinary offense deserving of an extended sentence. (See *Evans*, 87 Ill. 2d at 88-89; *People v. Price* (1987), 158 Ill. App. 3d 921, 929.) As our supreme court has stated, all murders are brutal and heinous, as well as unnecessary, to some degree; section 5—5—3.2(b)(2) requires that the offense at issue be accompanied by *exceptionally* brutal and heinous behavior. (*Andrews*, 132 Ill. 2d at 465-66.) The stringency of this standard accounts for the extraordinary readiness with which

courts of review have in recent years found that trial courts abused their discretion in imposing extended-term sentences on this ground. See, *e.g., People v. Andrews* (1989), 132 Ill. 2d 451, 464; *People v. Curtis* (1990), 207 Ill. App. 3d 628; *People v. Fields* (1990), 198 Ill. App. 3d 438, 442-45; *People v. Bedony* (1988), 173 Ill. App. 3d 613, 620-22; *People v. Price* (1987), 158 Ill. App. 3d 921, 929-30; *People v. Gil* (1987), 155 Ill. App. 3d 436, 439.

As one scholarly commentator has demonstrated, drawing the line between conduct that is *"exceptionally* brutal or heinous" (emphasis added) and that which is "merely" brutal and heinous is one of the most difficult and unclear tasks in criminal law. (See Johnston, *Problems in Imposing Extended-Term Sentences under Section 5—5—3.2(b)(2) of the Unified Code of Corrections,* 25 J. Marshall L. Rev. 491 (1992) (hereinafter Johnston).) The Illinois Supreme Court has defined "brutal" as " 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded,' " and "[h]einous" as " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal.' " (*La Pointe*, 88 Ill. 2d at 501, quoting Webster's Third New International Dictionary 286, 1050 (1986) (unabridged); see also *Andrews*, 132 Ill. 2d at 454-55.) There is no requirement that a murder involve torture or the infliction of unnecessary pain to qualify as "exceptionally brutal or heinous." (*La Pointe*, 88 Ill. 2d at 501; *Price*, 158 Ill. App. 3d at 929.) However, in construing section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)), which allows for capital punishment where the death of a victim under 12 years of age "resulted from exceptionally brutal or heinous conduct indicative of wanton cruelty," the supreme court has held that this aggravating factor does not apply unless the murder is accompanied by either prolonged pain or torture *or* premeditation. *People v. Tye* (1990), 141 Ill. 2d 1, 32; *People v. Lucas* (1989), 132 Ill. 2d 399, 445-46.

Similarly, the presence or absence of premeditation is among the most crucial considerations courts have brought to the application of section 5—5—3.2(b)(2) of the Unified Code of Corrections. These factors include (1) deliberation, premeditation or the lack thereof (compare, *e.g., La Pointe*, 88 Ill. 2d at 501; *People v. Mays* (1992), 230 Ill. App. 3d 748, 760-61; and *Hickman*, 143 Ill. App. 3d at 205-06, with *Andrews*, 132 Ill. 2d at 466; and *Fields*, 198 Ill. App. 3d 438); (2) whether the defendant exhibited any remorse for his crime (compare *La Pointe*, 88 Ill. 2d at 501; *People v. Waldron* (1991), 219 Ill. App. 3d 1017, 1046; and *Nelson*, 206 Ill. App. 3d at 966, with *Andrews*, 132 Ill. 2d at 466; *People v. Price* (1987), 158

Ill. App. 3d 921, 930; and *People v. Kane* (1986), 140 Ill. App. 3d 928, 931); (3) the amount of force used, including the infliction of torture, sadism, threats, emotional trauma and wholly gratuitous violence (see *Andrews*, 132 Ill. 2d at 465-66; *Moore*, 159 Ill. App. 3d at 1072-74; *People v. Jackson* (1984), 122 Ill. App. 3d 166, 170); and (4) the defendant's age and the extent and seriousness of his criminal record (see *Andrews*, 132 Ill. 2d at 465-66; *Waldron*, 219 Ill. App. 3d at 1046; *Price*, 158 Ill. App. 3d at 930). See also Johnston, 25 J. Marshall L. Rev. at 506-19.

■ After careful consideration, we conclude that this case is far more akin to those in which reviewing courts have reversed findings of exceptionally brutal and heinous conduct than those in which such findings have been upheld. In concluding that defendant's actions were within section 5—5—3.2(b)(2), the trial court focused primarily on (1) defendant's having strangled the victim twice with the electrical cord; (2) the taping of the victim's mouth and nose; and (3) defendant's indifference, even after he had rendered the victim helpless, to whether the victim lived or died. As brutal and revolting as defendant's actions were, we believe that the trial court erred in holding that defendant's offense was accompanied by *exceptionally* brutal and heinous behavior.

Given the jury's verdict and the trial testimony, we must assume that defendant undertook both acts of strangulation under the unreasonable belief in the need for self-defense. Thus, however grisly, these acts cannot support a finding of exceptionally brutal and heinous conduct; one who kills under a genuine although unreasonable belief in the need for self-defense cannot be said, on this basis alone, to have acted with wanton cruelty. (*Evans*, 87 Ill. 2d at 88.) The sentencing court did not have to accept defendant's account of why later he put tape over the victim's mouth and nose; however, the State's medical testimony was that this action and its consequences probably occurred at or very near to the time of the victim's death. Thus, this action does not provide a basis for finding prolonged torture or extraordinary gratuitous pain. See *People v. Lucas* (1989), 132 Ill. 2d 399, 446.

The final and most difficult consideration is that, even after the victim was subdued and helpless, defendant displayed a conscious indifference to her fate. By his own account, defendant applied the tape to the victim's face after she was no longer an apparent threat to his safety. He then dumped the victim into the manhole without knowing for sure whether she was alive or dead. At no time after the victim was unconscious did defendant call for help. The trial

court was entitled to conclude that, even though the jury found that defendant was acting under a belief in the need for self-defense when he inflicted the murderous strangulation wounds, defendant was no longer acting under this belief when he took further actions against a helpless victim after the crime of second-degree murder was complete.

Nonetheless, we cannot say that the " 'left for dead' factor" (Johnston, 25 J. Marshall L. Rev. at 509) supports a finding of exceptionally brutal and heinous conduct. Indifference or hostility to the survival of the victim is inherent in the crime of murder. (*Andrews*, 132 Ill. 2d at 465-66; *People v. Gil* (1987), 155 Ill. App. 3d 436, 439.) In *Andrews*, the defendant, without provocation of any sort, shot an unarmed and defenseless victim to death, even though the victim's death was not necessary to the robbery that the defendant was helping to commit. Nonetheless, the supreme court reversed a finding that this first-degree murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

We simply see no rational basis to reconcile a holding that such conscious disregard for the life of a defenseless victim in a case of *first-degree* murder should not be a sufficient basis for an extended term (as *Andrews*, which is of course binding on this court, held) with a holding that conscious disregard for the life of the victim should be a sufficient basis for an extended term here. As has been noted, the " 'left for dead' factor is perplexing because, in most instances, such as murder, attempted murder or manslaughter, it would seem very unlikely for the defendant to attempt to render aid to the victim." Johnston, 25 J. Marshall L. Rev. at 509.

The remaining factors commonly considered under section 5—5—3.2(b)(2) also militate against the extended-term sentence. Although the trial court noted defendant's prior convictions of burglary to a vehicle and theft, the court did not consider these convictions in imposing the extended sentence. Even had the court done so, the limited and nonviolent character of these offenses would scarcely bolster a finding of wanton cruelty on the part of defendant, who was 19 years old at the time of the crime. Although defendant initially lied to the police about the incident, he soon thereafter led the police to the body, revealed other hidden evidence to the police, and verbally expressed at least a measure of regret about the killing at the interview with Sergeant Holderbaum and at his allocution. As noted, the jury's verdict of second-degree murder negates any reliance on the factor of premeditation.

We have examined the cases cited by the State in its three-page argument, and we conclude that these cases are either irrelevant or clearly distinguishable.

We hold that the trial court abused its discretion in imposing an extended sentence based on a finding of exceptionally brutal and heinous behavior. Pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4); see *Fields*, 198 Ill. App. 3d at 444-45), we reverse the imposition of the extended sentence and reduce defendant's sentence to 15 years' incarceration, the maximum for second-degree murder.

Defendant's second argument on appeal is that the sentencing court failed to give adequate consideration to such mitigating factors as defendant's youth, his difficult family background, his relatively limited criminal record, his attempts to educate himself and to support his family, and his prospects for rehabilitation and reintegration into society.

■ Inasmuch as defendant's extended-term sentence has been reversed, we conclude that the trial court did not otherwise abuse its discretion in weighing the factors in aggravation and mitigation. A trial court is not required to place greater weight on the defendant's potential for rehabilitation than on the seriousness of the offense. (*People v. Fort* (1992), 229 Ill. App. 3d 336, 342; *People v. Mack* (1985), 133 Ill. App. 3d 788, 793.) Even where a defendant's actions do not merit a finding of exceptionally brutal and heinous behavior, the circumstances that the trial court erroneously relied upon to impose an extended sentence may suffice to uphold the imposition of the maximum sentence. *People v. Bedony* (1988), 173 Ill. App. 3d 613, 621-22.

The offense *sub judice* was indeed serious and brutal, even accepting the defendant's entire version of the incident. We note that this version, although credited at least partially by the jury, was in many respects impeached or inherently implausible. For example, defendant's account of the strangulation was inconsistent with the testimony of the police that, when they searched defendant's apartment, they found that the cord used to strangle the victim had been knotted at both ends; defendant's account of the attacks the victim made upon him is undercut by the officers' testimony that defendant appeared "normal" when the police arrived; and defendant's assertion that the victim somehow injured herself with the hammer she was swinging is unworthy of credence. For one supposedly in a state of terror, defendant also showed considerable planning in disposing of the body. However, even were the sentencing court or this

court required to accept defendant's testimony *in toto*, the seriousness of the offense would merit the imposition of the maximum sentence.

Defendant also emphasizes his youth and his prospects for rehabilitation. However, as the appellate court recognized over 15 years ago, "[t]he day is past when this court, or any court, should quiver like a pole-axed blancmange at the mention of youth and rehabilitation." (*People v. West* (1977), 54 Ill. App. 3d 903, 909; see also *People v. Generally* (1988), 170 Ill. App. 3d 668, 677.) In any event, the trial court had ample reason to take a dim view of defendant's potential for rehabilitation. As defendant admits, he had prior convictions, albeit of nonviolent offenses, in Utah; he had been penalized for violent conduct while in jail; and he had been dishonorably discharged from the Navy because of his antisocial personality. Defendant's own character witness, Ron Moss, called him a "natural liar." The sentencing court legitimately took these facts into account. The court imposed an extended sentence of 30 years; had it not imposed the extended sentence, the court would have imposed the maximum 15 years' nonextended sentence. We cannot say that such a sentence is excessive.

As the defendant does not appeal his conviction of second-degree murder, that conviction is affirmed. Defendant's sentence is reduced from 30 years' imprisonment to 15 years' imprisonment.

Affirmed as modified.

GEIGER, J., concurs.

JUSTICE DOYLE, dissenting:

I agree with the majority conclusion that a murder committed under the unreasonable belief in the need for self-defense may nonetheless be accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. I respectfully disagree, however, with the holding that the trial judge abused his discretion in finding that the murder in this case was accompanied by such behavior.

The majority may have confused, in part, the determination of whether the behavior may be characterized as exceptionally brutal or heinous with the separate question of whether the sentence was excessive in light of the totality of aggravating and mitigating factors. A trial court's finding that the crime has been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty permits but *does not require* it to consider imposing an ex-

tended-term sentence. (See *People v. Frey* (1984), 126 Ill. App. 3d 484, 487; Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b); Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2(2).) Section 5—5—3.2(b)(2) specifically refers to "the offense" of which the defendant was convicted. It seems to follow, therefore, that any determination of whether the offense has been accompanied by exceptionally brutal or heinous behavior must be limited to an examination of a defendant's actions surrounding the commission of the offense as opposed to the various other factors of aggravation and mitigation. Yet, in an effort to explain the apparent conclusion that the sentence was excessive, the majority refers to the defendant's age and nonviolent criminal record as if those factors are relevant to the issue of how defendant acted while committing the crime. The product of this hybrid analysis of separate issues is unfortunately a distorted concept of what constitutes exceptionally brutal or heinous behavior.

Even regarding, for these purposes, defendant's conduct in twice strangling the victim with an electrical cord because he believed, albeit unreasonably, that such conduct was justifiable under principles of self-defense, defendant's continued methodical infliction of lethal force against this helpless victim is, in my view, a fair illustration of what is meant by "exceptionally brutal or heinous behavior indicative of wanton cruelty." The trial court found that after the victim became limp from the second strangulation defendant heard her gasp for air and responded by applying athletic tape to her mouth and nose, making "completely impossible" any chance for survival. Then, according to defendant's testimony, he placed a plastic bag over the victim's face and hauled her on a garbage cart to a manhole where he placed the victim in a sewer, not knowing whether she was alive or dead. It is evident that these acts were performed with at least some degree of deliberation.

I consider such conduct to exceed what the majority refers to as mere "indifference to the survival of the victim." "In evaluating the brutality and heinousness of an offense, the entire spectrum of facts surrounding the given incident must be analyzed and evaluated." (*People v. Grady* (1982), 107 Ill. App. 3d 970, 977.) Heinous or brutal behavior toward the victim can occur even after the victim is dead. *People v. Devine* (1981), 98 Ill. App. 3d 914, 925.

I further disagree with the majority's assessment that the facts of the present case are more akin to those cases in which reviewing courts have reversed findings of exceptionally brutal and heinous conduct than those in which such findings have been upheld. I am concerned that today's decision may leave trial judges lost at sea in

performing the sometimes difficult task of identifying exceptionally brutal or heinous behavior indicative of wanton cruelty. It is my opinion that there was no abuse of discretion in the trial court's sentencing determination.